(Nos. 40150, 40151 cons.—

KILLARNEY WATER Co. *et al.,* Appellees, *vs.* ILLINOIS COM-
MERCE COMMISSION, Appellant.

*Opinion filed May 18, 1967.*

WILLIAM G. CLARK, Attorney General, of Springfield,
(EDWARD G. FINNEGAN, Assistant Attorney General, of
counsel,) for appellant.

MCDERMOTT, WILL & EMERY, of Chicago, (FRANKLIN
J. LUNDING, JR., FRANK E. BABB, and FRANK M. COVEY,
JR., of counsel,) for appellees.

HARRY R. BEGLEY and CHAPMAN AND CUTLER, both of
Chicago, (JOHN N. VANDER VRIES, of counsel,) for *amici
curiae.*

Mr. JUSTICE SCHAEFER delivered the opinion of the
court:

Pistakee Highlands Water Company, (Pistakee), and
Killarney Water Co., (Killarney), are public utilities en-
gaged in furnishing water service in McHenry County. On
February 10, 1965, each utility petitioned the Illinois Com-

merce Commission for an order determining the original cost of its water plant in accordance with the Commission's General Order No. 183. From orders of the Commission requiring adjustments in their accounts, each utility appealed to the circuit court of McHenry County, which reversed the orders of the Commission. The Commission's direct appeals to this court (Ill. Rev. Stat. 1965, chap. 110, par. 101.28 —1.) have been consolidated for opinion.

In each case the water pumping plant and the distribution system was constructed and placed in operation by Pistakee Builders, Inc., (Builders), a company engaged in real-estate development. The Commission found that Builders and the two utilities were under common control. The controversy in each case centers about the proper treatment of funds which were segregated by Builders from the amounts it collected from purchasers of lots, and placed in "water reserve" accounts. Broadly stated, the question is whether these funds should be treated as "Contributions in Aid of Construction", or as "Donations from Stockholders", within the meaning of the Uniform System of Accounts for Water Utilities prescribed by the Commission. While this proceeding does not directly involve rates, it may have a bearing upon them, for, as the utilities note, "Historically, 'Contributions in Aid of Construction' have not been included in the determination of the fair value of a utility for rate purposes, whereas 'Donations Received from Stockholders,' * * * are properly a part of the fair value of the stockholders' investment * * *."

The facts in the two cases, although similar, are not identical. In the case of Pistakee, the form of contract for the sale of lots which was used prior to 1956 provided: "Purchaser agrees to pay to seller the sum of $200.00 per lot * * * in addition to payments hereinabove set forth * * * for making water connections either in the street fronting on said property or in the easements for public utilities on said property from a central water system, said

sum to be turned over at option of seller to a separate utility company, to be organized for the purpose of installing the same * * *." After 1956, Pistakee's contracts provided: "Price of lot includes water main to lot line or easements."

The Commission found that, of the amounts collected from its purchasers, Builders segregated $200 per lot in a "water reserve" account. As the water plant was constructed it transferred amounts from this account to Pistakee, and charged the cost of constructing the plant against the amounts so transferred. The Commission also found that until the end of 1961 Pistakee recorded the transfers from the "water reserve" account as "Contributions in Aid of Construction." But at the end of 1961 it reclassified $50,-223.40 from "Contributions in Aid of Construction" to "Accounts payable to shareholders," and thereafter again reclassified that amount as "Donations received from shareholders." Pistakee sought to justify these reclassifications on the ground that the $50,223.40 represented the sum of the $200 payments made by lot purchasers on post-1956 contracts. Its position was that it was not obligated to treat these payments as contributions in aid of construction, although it admitted that it was obligated to use the similar amounts collected under pre-1956 contracts "to have water available to the lot."

Since the funds that Pistakee sought to treat as contributions from stockholders were obtained by Builders from the purchasers of lots, the Commission sought to ascertain whether, apart from the various accounting reclassifications, Builders had treated those funds as its own. Builders refused to furnish information concerning the tax treatment of each of the utility plants and the water reserve accounts by the builder or developer of the respective water systems. When the Commission's examiner proposed that a subpoena be issued to compel the production of these records, the attorney for Builders stipulated that, subject to relevancy, the Commission might draw whatever inferences

it saw fit as to the way these funds were treated by Builders and the utilities for Federal tax purposes.

The Commission rejected Pistakee's accounting and ordered that the contested $50,223.40 be recorded as Contributions in Aid of Construction.

In the case of Killarney, the form of contract used by Builders for the sale of lots is not in the record. Apparently, however, it was similar to the post-1956 Pistakee form and contemplated that the price paid by the purchaser included a water main at the lot line. Upon oral argument, Killarney's attorney conceded that if mains were not made available at the lot line without cost to the purchaser of the lot, the contract would have been breached. From the amounts collected from purchasers of lots, Builders allocated $200 per lot, or sometimes $250, to a "water reserve" account. It constructed Killarney's plant at a total cost of $92,204.92. Builders contracted to sell the plant to one of its officers, Ambrose E. Thillman, for approximately 25% of the construction cost. It charged $73,500 of the construction costs against the water reserve account, and charged the balance of the costs to Thillman, who assigned his contract to Killarney in exchange for its capital stock.

Since Builders sought to treat the amounts that had been credited to the water reserve as its property for the purpose of donating a part of it to Thillman, the Commission again sought to ascertain whether Builders had treated those funds as its own for other purposes. Again Builders refused to furnish information concerning its tax treatment of the transactions involved, and entered into the stipulation that has been described.

The Commission ordered that the $73,500 expended from Builders' water reserve account in the construction of Killarney's plant be recorded as "Contributions in Aid of Construction."

In the Pistakee case the utility states the issue in these terms: "The issue to be determined is whether the forgiving

of a debt owed by a utility to its stockholder should be accounted for by the utility as a donation received from its stockholder or as a gift to the utility for construction of water facilities from purchasers of lots from the stockholder."

And in the Killarney case it describes the issue as follows: "The issue to be determined is whether or not the excess original cost of the water facilities transferred to Killarney by its sole stockholder over the price paid by its sole stockholder should be recorded on Killarney's books of account as having been received from the stockholder or should be recorded as having been received from the purchasers of lots from an affiliated land developer as a gift for water plant construction."

Each of these statements of the issue assumes the question to be decided and disregards the underlying facts upon which the Commission's order was based. In the Pistakee case it assumes that the funds in Builders' water reserve account, which were used by Builders to pay for the construction of the water facilities, belonged to Builders. But Builders had agreed with the lot purchasers that water would be available at the lot line, and a failure to make water available at the lot line without additional cost to the purchasers would have violated the contract. It is apparent that neither Builders nor Pistakee regarded these funds as belonging to Builders while the plant was being constructed. They were not treated as income by Builders for tax purposes, and the sums advanced were recorded by Pistakee as contributions in aid of construction, and not as donations from stockholders during the entire 1956-1961 period. "Unquestionably, the practical construction or uniform conduct or practice of the parties under a contract is a consideration of much importance in ascertaining its meaning, and that consideration is entitled to great, if not controlling, influence in ascertaining the parties' understanding of the contract terms and language, since the parties are in the

best position to know what was intended by the language employed." 17 Am. Jur. 2d Contracts, sec. 274; see also *Wood River Drainage and Levee District* v. *Alton Box Co.,* 26 Ill.2d 53, 59-60.

In the Killarney case Builders had also accumulated a reserve account from the payments it received from the purchasers of lots, and it paid for the water plant out of the account. The utility asserts that a 75 % loss occurred when the water facilities were transferred at 25% of their cost, from Builders to Thillman, who was one of its officers, and the son-in-law of the individual who controlled Builders. The question here, as in the Pistakee case, is whether the funds in the reserve account were the property of Builders when the transfer was made. Most of the cost of the water plant was, of course, incurred in the construction of water mains. We have assumed, upon the basis previously stated and in the absence of the actual contracts between Builders and the Killarney lot purchasers, that the price paid by the purchasers included water at the lot line. Builders discharged that contractual obligation from funds supplied by the purchasers which it did not treat as its income, or as funds belonging to it.

If the amount so treated somehow became the property of Builders or its affiliates, the burden of explanation that rested upon the utility was not met by pointing to a bookkeeping entry. The utility apparently realized this and called as a witness the president of the principal developer of the properties who testified that "the seller of the lot did not intend to charge or collect any money for the utility operation from the purchaser of the lot  *  *  *." If we assume that by the "utility operation" the witness referred to the construction of the water plant, that intention does not appear to have been carried out.

The significance of the way the parties to a transaction treat it for tax purposes, as indicating their intention, is pointed out in *Hammer* v. *Sanders,* 8 Ill.2d 414 at 421. The

accountant who testified for the utility in each case, testified that "The setting up of a reserve of this kind must be done out of income of the company. If a buyer paid $1200 for a lot, the seller would enter on its books as received on sales of land $1000, and credit the water reserve $200. The $200 was omitted from income by the seller." He also testified that it was correct to say that "in effect the combination of the $200 payments which were made by the purchasers of the lots went to absorb the difference between the cost of construction and what Mr. Thillman paid for the water system."

The utilities have argued that the funds in question can not be considered as "contributions in aid of construction" because the record does not contain any evidence of a donative intent on the part of the purchasers of lots. But this emphasis upon the law of gifts in connection with the determination of the content of the accounting classification seems misplaced. The intention of the lot purchaser was to receive title to the lot and an available water supply for the price that he paid. The Commission's description of the content of the account in question differentiates between a donation and a contribution. It states: "This account shall include donations or contributions in cash, services, or property from states, municipalities or other governmental agencies, individuals and others for construction purposes." To import the law of gifts into this account would cause obvious difficulties.

While this proceeding does not establish the rates to be charged by the utility and is intended primarily as a means of establishing an historical record of the original costs, fairness to the consumers requires that the record be as accurate as possible so that they will not be automatically required in the future to pay rates based in part upon facilities for which they have themselves already paid.

We are of the opinion that the Commission's orders were correct upon the evidence before it, and upon the

facts that it was entitled to assume from the failure and refusal of the utilities and their affiliates to produce evidence. "As we have said: '* * * our investigation is limited to the questions whether the commission acted within the scope of its authority, whether its findings have substantial foundation in the evidence, and whether a constitutional right has been infringed.' *Galt* v. *Illinois Commerce Com.,* 28 Ill.2d 501, 505; *Forest Preserve District* v. *Illinois Commerce Com.,* 12 Ill.2d 319; *Chicago, Burlington & Quincy Railroad Co.* v. *Illinois Commerce Com.,* 33 Ill.2d 274." *Champaign County Telephone Co.* v. *Illinois Commerce Com., ante.* at p. 312.

The judgments of the circuit court of McHenry County are reversed, and the orders of the Illinois Commerce Commission are confirmed.

*Judgments reversed; orders confirmed.*