(No. 43137.—

Du Page Utility Company, Appellant, *vs.* Illinois Commerce Commission, Appellee.—(Meadows Community Association *et al.*, Separate Appellants.)

*Opinion filed January 25, 1971.—Rehearing denied March 31, 1971.*

CHAPMAN AND CUTLER, of Chicago, (JOHN N. VANDER VRIES and DANIEL J. KUCERA, of counsel,) for appellant.

PEREGRINE, STIME & HENNINGER, of Wheaton, (CARL F. J. HENNINGER, of counsel,) for separate appellants.

WILLIAM J. SCOTT, Attorney General, of Springfield, (PETER A. FASSEAS, DONALD C. SHINE and THOMAS CASSIDY, Assistant Attorneys General, of counsel,) for appellee.

PER CURIAM : This appeal arises from an order on utility rates entered by the Illinois Commerce Commission, affirmed by the circuit court of Du Page County, and is prosecuted directly to this court pursuant to Rule 302. 43 Ill.2d R. 302.

Du Page Utility Company (Du Page), provides water

and sewage disposal service to approximately 840 customers, most of whom are residents of Oak View and Meadows subdivisions located in and near the village of Lisle. On February 20, 1967, Du Page filed with the Commission a new schedule proposing an increase in rates for both services, and was met with the opposition of the Oak View Home Owners Association and the Meadows Community Association, to whom the Commission granted leave to intervene in the cause. After several hearings the Commission entered an order which granted an increase in rates, but not to the extent that had been sought. Both Du Page and the intervenors applied for a rehearing, which was granted, and on April 16, 1968, the Commission entered a second order, being the one involved in this appeal. With the exception of adjustments to reflect the cost of water fluoridation, evidence of which was offered and received for the first time on rehearing, the second order was substantially the same as the first. Du Page also filed an application for rehearing in respect to the second order, which was denied, but the intervenors did not so apply. Thereafter, on separate appeals by Du Page and the intervenors to the circuit court, the order of the Commission was affirmed, and it is the same parties who have appealed to this court. Broadly speaking, it is the contention of Du Page that the Commission made improper deductions from its rate base, whereas it is contended by the intervenors that still further deductions should have been made.

We are met at the outset with a contention of Du Page that the appeal of the intervenors is improper and should be dismissed, its theory being that the failure of the intervenors to apply for a rehearing in respect to the second order caused the circuit court to lack jurisdiction to entertain the intervenors intermediate appeal. (See: Ill. Rev. Stat. 1967, ch. 111⅔, pars. 71 & 72; *Scherer Freight Lines, Inc.* v. *Commerce Com.,* 24 Ill.2d 359; *Alton Railroad Co.* v. *Commerce Com.,* 407 Ill. 202.) The court below denied

a joint motion of the Commission and Du Page seeking dismissal of the intervenor's appeal on the same ground and, we find, correctly so. Where an order of the Commission entered on rehearing is substantially the same as the order being reconsidered, and makes only minor revisions, a second application for rehearing is not required. (*Continental Air Transport Co.* v. *Commerce Com.*, 38 Ill.2d 563; see also, *Central Illinois Light Co.* v. *Illinois Commerce Com.*, Docket No. 43013.) Here, even though evidence of the cost of fluoridation was heard for the first time on rehearing, it resulted only in minor revisions and did not alter the basic issues between the parties, and the two orders were substantially the same.

There is, for the most part, no dispute as to the law which controls in rate cases of this nature, but controversy arises as to its application to the facts of this case. Our law contemplates that utility rates will be just and reasonable and fixed so as to produce a reasonable return on the property used and employed in the public service. To this end we held in *Illinois Bell Telephone Co.* v. *Commerce Com.*, 414 Ill. 275, 286, that the rates fixed by the Commission "* * * should be sufficient to provide for operating expenses, depreciation, reserves that are necessary in good business judgment and operations and a reasonable return to the investor on the basis of the fair value of the utility property." And in the ascertainment of the "fair value" of such property, it has been consistently stated that "* * * the original cost of construction, the amount expended in permanent improvements, the present cost of construction, the probable earning capacity of the property under the particular rates prescribed by statute, and the sum required to meet operating expenses, are all matters for consideration and are to be given such weight as may be just and right in each case." (*State Public Utilities Com. ex rel. City of Springfield* v. *Springfield Gas and Electric Co.*, 291 Ill. 209, 219; *Peoples Gas Light and Coke Co.* v. *Slattery*, 373 Ill.

31; *Illinois Bell Telephone Co.* v. *Commerce Com.,* 414 Ill. 275.) More recently in *Killarney Water Co.* v. *Commerce Com.,* 37 Ill.2d 345, where the facts disclosed that a water company had in effect been built with funds furnished by purchasers of the lots serviced by the utility, we held that the concept of plant fair value for rate-fixing purposes does not include contributions in aid of construction made by the consumers of the utility's service, since it would be unfair to require such consumers to pay rates based upon the value of a facility for which they have themselves already paid. (See also: *Preston Utilities Corp.* v. *Commerce Com.,* 39 Ill.2d 457; *Westwood Lake, Inc.* v. *Metropolitan Dade County Water and Sewer Board* (Fla.), 203 So. 2d 363; *Mississippi Public Service Com.* v. *Hinds County Water Co.* (Miss.), 195 So. 2d 71.) And, conversely, where consumers have borne the cost of a utility plant, the utility stockholders should not be permitted to recover a return on money that they have not invested.

Following the guidelines of the foregoing decisions, and based upon the evidence before it, the Commission, after making allowances for depreciation, found the original cost of the Du Page plant to be $788,610.52 and reproduction cost new to be $888,214.04. And after applying weighting factors to each figure, about which factors there is no dispute, the fair value of the plant was found to be $813,214.04. From the latter figure, however, the Commission deducted a total of $814,922.19, and thus arrived at a plant fair value of zero for rate-making purposes. Included in the sum deducted were the following: (1) $798,702.25 deemed by the Commission to have been contributions in aid of construction; (2) $15,669.64 representing customer advances for construction; and (3) an unamortized investment credit of $620.30. We find in Du Page's brief no argument or authority concerning the last item, and thus we need consider only its contentions that the first two items were improperly deducted. Looking first and principally to the item of $798,-

702.25, Du Page insists that it does not represent contributions in aid of construction, but is in fact cash donations to capital made by a corporate affiliate, and contends that our decision in *Killarney* does not stand as authority for its deduction from the rate base.

Facts gathered from the record disclose that Du Page has three shareholders, each of whom initially invested $5,000 for 50 shares of capital stock, respectively, which represents all of the issued and outstanding stock in the utility. There is no evidence that any of them personally invested further funds or made contributions to capital. Each is also an officer and director of Du Page, and each has been paid an annual salary of approximately $10,553 for their services as officers. The same three men were originally partners and subsequently equal shareholders in Oak View Improvement Company, (hereinafter referred to as the development company), a corporation engaged in the development of the real estate serviced and to be serviced by Du Page. The development company sold both improved and unimproved lots in the Meadows and Oak View subdivisions, and prospective purchasers were informed that all improvements, including sewer and water, were included in the price of the lots. A form of contract introduced into evidence provided that all improvements, including sewer and water, were in and fully paid for and that no assessments would be levied therefor.

Funds from the sale of the lots were deposited in a bank account of the development company and, from time to time, some of such funds were subsequently transferred to Du Page. In the books of the latter these funds were carried in a ledger account designated as "Contributions in Aid of Construction" and, as of September, 1966, there was a closing balance of $739,195.25 in such account. But on December 31, 1966, Du Page changed the designation of the account to "Capital in Excess of Par Value of Shares." This change, we observe, took place but seven weeks before the

initiation of the instant proceeding to increase rates and, as disclosed by the records of this court, subsequent to the orders of the Commission later affirmed by this court in the *Killarney* case. (37 Ill.2d 345.) Further, certified copies of annual corporate reports, filed by Du Page with the Secretary of State and introduced in evidence by the intervenors, reflected that during the years 1962 through 1967, inclusive, Du Page reported no paid-in surplus and showed as its sole capital $15,000 of stated capital. The Commission found that the funds transferred by the development company to Du Page were rightly contributions in aid of construction, rather than capital surplus, and found that such funds had been used by Du Page to build its utility plant. While not so stated in express terms, it is the thrust of Du Page's arguments that these findings are against the manifest weight of the evidence.

To support its contention that the consumers, or lot purchasers, had contributed nothing to the construction of the utility plant, Du Page represents the record as establishing two things. First, that Du Page itself purchased, paid for and installed all of its utility plant with its own funds prior to the sale of lots; and, second, that the cost of plant was not charged to, or allocated to, or paid by the lot purchasers. But we do not find clear or convincing proof for either proposition. Just when the utility plant was completed in relation to the beginning of the sale of lots does not appear, and we note that Du Page's president testified: "I cannot tell you the exact date that it was started. * * * The sewage plant, and the water plant developed at the same time and along with the development of the Oak View Subdivision and the Meadows Subdivision." The same witness did indeed testify that the cost of the utility had not been amortized by the development company over the purchase price of the lots, and further stated that Du Page had not incurred any indebtedness with reference to the construction of sewer and water facilities, but had paid for "everything"

with funds supplied by "the stockholders and affiliated people." Also, on cross-examination, however, he was forced to concede that in a 1963 proceeding before the Commission involving Du Page, an accountant then employed by the utility had testified that the funds received from the sale of the lots were treated as assets of the development company, that the expense of developing the sewer and water systems was carried as an element of the cost of the land, and that the funds transferred to Du Page were considered as development costs and prorated over the lots to be sold and expensed to those units as they were sold. In addition, it appears from his testimony that the developer charged off the funds transferred to Du Page as expenses for income tax purposes and thus arrived at a zero tax basis for such funds. And in connection with the contention that the utility was fully installed and paid with Du Page's own funds prior to the time lots were sold, we note the accountant also testified in the prior proceeding that the development company had made "advances or donations" to Du Page for the construction of water mains and underground water facilities.

Nor can we agree, as further claimed by Du Page, that the testimony of its accountant who testified in the present proceeding establishes that Du Page paid for its plant with its own funds. When testifying in regard to the utility's books the witness said he assumed that the original cost of plant was $875,418.55 and that Du Page had obtained cash and "spent the cash for the plant." But when specifically asked if he meant the cash had been furnished by Du Page, he stated: "I didn't say that. I said it was plant purchased by Du Page over a period of years. * * * cash came from various sources, part from operation. It came from donations as you mentioned."

The legislature has made the fixing of utility rates an exclusive function of the Commission, and although a court may hold that rates authorized by the Commission are inadequate or illegal and restrain their enforcement, it cannot

make new rates. (*Peoples Gas Light and Coke Co.* v. *Slattery*, 373 Ill. 31; *South Chicago Coal and Dock Co.* v. *Commerce Com.*, 365 Ill. 218.) Orders of the Commission "are entitled to great weight and when the sufficiency of an order is questioned it will not be set aside unless it is clearly against the manifest weight of the evidence, is arbitrary or unreasonable, or in clear violation of a rule of law." (*Illinois Bell Telephone Co.* v. *Commerce Com.*, 414 Ill. 275, 289-290.) We find no such deficiency in the order here being reviewed. Despite the claims of Du Page, the weight of the evidence, including its own record treatment of the funds involved, clearly establishes that the utility plant was, in fact, paid for by the lot purchasers in the two subdivisions, and that the amount so contributed by the purchasers should, consistent with *Killarney*, be excluded from the rate base.

The situation here is little different from that in the case of *Re Green-Fields Water Co.*, (N.J. 1964) 53 PUR 3d 670, another case where there was an attempt by a utility to reinstate to rate base the cost of a part of the utility previously written off for tax purposes as land development costs, and with which we are in accord. In that case, water mains having a cost of about $150,000 were installed by two development companies which paid the installation costs, charged off the costs for income tax purposes, and offset the costs against sales prices of homes, after which the mains then had a zero tax basis to the development companies. Thereafter, the development companies, whose principal shareholders owned one half of the securities of the company, conveyed and transferred the mains to the utility in consideration of 1500 shares of stock having a par value of $100 per share. On the basis of such facts the New Jersey Public Utilities Commission found and concluded as follows: "It also appears that the developers in the area turned over the entire distribution facilities required to furnish water service to their housing developments and

that these facilities were paid for by such developers and the expenses thereof were fully recovered for income tax purposes so that the value of these facilities to the transferors was carried at a zero basis.

" 'In view of these conclusions it is the board's opinion that $150,000 of utility plant representing the distribution system facilities was, in fact, paid for by the homeowners in the developments and contributed to the petitioner. Under these circumstances the board is of the opinion that the computation of rate base for purposes of this proceeding should be reduced by $150,000.' " In the case presently before us it is true that Du Page, rather than the development company, actually constructed the plant, but this is a distinction without a difference. In both cases the facilities were, in fact, paid for by the lot purchasers in the housing developments, and the cost of the facilities written off for tax purposes as land development costs. Accordingly, we hold that the Commission properly held that the $798,702.25 was contributions in aid of construction, and properly deducted it from the rate base.

Without citation of authority or convincing argument, Du Page next contends that even if it be conceded that the funds transferred to it by the development company were contributions in aid of construction, they should have been deducted only from the original cost of the plant or, alternatively, only from the net cost of the plant, *i.e.,* gross original cost and reproduction new, before depreciation. But to adopt either theory would require the consumers to in part pay again for facilities for which they have already paid in full, contrary to our decision in *Killarney.*

It is next urged that the Commission improperly deducted the sum of $15,669.64, representing customer advances for construction, for the reason that there is a possibility that some or all of such advances may be refunded entirely. We think it sufficient to say that until such refunds in fact occur, the Commission could properly treat this item

as further contributions in aid of construction and properly deduct it from the plant fair value as it did.

The Commission also found that the annual salaries of the three officers, a total of $31,680, were excessive and out of proportion to the extent and nature of the services performed and, for rate purposes, disallowed one half thereof, or $15,840, as an operating expense. Du Page's contention that this was an arbitrary action of the Commission, and totally without support in the record, borders on the facetious. The uncontradicted testimony of the officers themselves established that none had previous experience in managing a utility, that they worked only part time and that they had maintained only a minimal contact with day-to-day operations. None could produce records of time spent at the utility business, none maintained an office there and each was active as president of one of three different construction firms. Further, a witness for the Commission testified that he had reviewed the salaries in light of those paid by other companies under the Commission's jurisdiction and stated that he had found no instance where a utility servicing but 840 customers paid its officers salaries of such magnitude. Nor is Du Page aided by *Village of Milford* v. *Commerce Com.,* 20 Ill.2d 556, where it was held that total salaries of $62,400 for the three officers of a telephone company was not unreasonable or excessive. In that case the officers worked full time, one of them even performing the company's legal services without charge, and the addition of modern equipment increased the scope and complexity of their duties. There are few, if any, parallels in the instant case. Based upon the record, the Commission was correct in its finding that the larger salaries were not justified.

In regard to this deduction, the intervenors go even farther and contend that the Commission should not have allowed any of the officer's salaries in the determination of the rate base, their position being that the officers performed no services of value to the utility causing the payments to

them to amount to no more than a distribution of profits. To agree to such a contention would produce a result that is arbitrary and against the manifest weight of the evidence. The testimony of the officers that they performed part time services for the company and the extent of those services was uncontradicted, and there was no proof, nor do we find, that the services were without value to the company.

The Commission also allowed as an operating expense the sum of $15,000, to be amortized at the rate of $3,000 annually, for rate-case expense, and it is the contention of the intervenors that this allowance was improper. While a matter of first impression in this court, we find that rate-case expense is ordinarily properly and fairly allowed as an operating expense. See: *Streator Aqueduct Co.* v. *Smith* (Dist. Ct. S.D. Ill. 1923), 295 Fed. 385, 391; *Westwood Lake* v. *Metropolitan Dade County Water and Sewer Board* (Fla.), 203 So. 2d 363, 366; *West Ohio Gas Co.* v. *Public Utilities Com. of Ohio* (1934), 294 U.S. 63, 79 L. Ed. 761; *Scranton-Spring Brook Water Service Co.* v. *Public Service Com.,* 119 Pa. Super. 117, 181 Atl. 77; *Driscoll* v. *Edison Light & Power Co.* (1939), 307 U.S. 104, 83 L. Ed. 1134.

Complaint is also lodged by the intervenors because the Commission allowed Du Page a working capital allowance of $16,555 in the rate base. We find no merit to this contention. Although we believe that the arguments of the intervenors on this point distort the record in respect to the sufficiency of the utility's operating funds and yearly cash balances, it is sufficient to say that the Commission and this court have long approved the addition to rate base of a working capital allowance, in relation to billing periods, to enable a utility to meet current expenses and contingencies which develop in day-to-day operations. See: *State Public Utilities Com.* v. *Springfield Gas Co.,* 291 Ill. 209; *Peoples Gas Light and Coke Co.* v. *Slattery,* 373 Ill. 31.

Finally, the intervenors contend that the Commission,

in computing operating expense, improperly allowed Du-Page a depreciation rate of approximately 1.6% of the depreciable plant. The propriety of allowing a reasonable depreciation deduction on the property of a utility is not dependent upon the source of funds for the original construction of the facility. (*Cf. Langan* v. *West Keansburg Water Co.,* 51 N.J. Super. 41, 143 A. 2d 185.) Du Page will be required to replace from time to time properties which have become obsolete or whose useful lives have expired, in order to sustain service to its customers. This being the case, Du-Page is entitled to a reasonable depreciation deduction on its entire plant in service for the purpose of computing its operating expenses. Intervenors' contention that current maintenance will continually extend the life of the system begs the question since depreciation by definition includes only that loss which cannot be restored by current maintenance. See *Lindheimer* v. *Illinois Bell Telephone Co.* (1934), 292 U.S. 151, 167, 78 L. Ed. 1182.

The judgment of the circuit court of Du Page County is affirmed.

*Judgment affirmed.*