334 So.2d 622 (1976)
FLORIDA CITIES WATER COMPANY, Appellant,
v.
BOARD OF COUNTY COMMISSIONERS OF SARASOTA COUNTY, Florida, Appellee.
No. 75-1547.
District Court of Appeal of Florida, Second District.
June 30, 1976.
Rehearing Denied July 26, 1976.
B. Kenneth Gatlin and John W. Costigan of Madigan, Parker, Gatlin, Truett & Swedmark, Tallahassee, for appellant.
Robert L. Hesse of Nelson, Hesse, Cyril & Weber, Sarasota, for appellee.
GRIMES, Judge.
This case involves the proper setting of a utility company rate base.
Florida Cities Water Company (Florida Cities) operates a water and sewer utility within Sarasota County pursuant to a franchise issued by the Board of County Commissioners. *623 The rates for the utility are set by the Board in accordance with a utility franchise ordinance. In 1973, Florida Cities filed an application with the Board for authorization to increase its rates for water and sewer services. Following public hearings, the rates were increased but not to the extent requested. Florida Cities then petitioned the circuit court for a writ of certiorari to the Board of County Commissioners. The court denied the petition. Florida Cities now seeks a review of the court order upholding the rate order entered by the Board.
Under the ordinance, the Board is supposed to "fix and determine a rate which allows for reimbursement of operating costs and a fair and reasonable net return on the original cost of the system to the person first dedicating it to public service, which shall not include contributions in aid of construction or customer contributions." Florida Cities contends that the Board improperly limited its rate base in three particulars, each of which shall be discussed in turn.

Deletion of Engineering Overhead
Florida Cities originally acquired its water and sewer plant and system by the purchase of stock of existing water and sewer companies. At that time, a firm of consulting engineers made an independent survey for the purpose of appraising the value of the system and of providing a basis for properly classifying the plant according to the National Association of Regulatory Utility Commissioners Uniform System of Accounts. The consulting engineers concluded that the cost of plant in service as shown on the records of the purchased utilities failed to include the capitalization of certain engineering overheads incurred in the construction of the system. While the prior owners failed to carry these overheads as costs of plant in service, there is no doubt that the expenditures were made and that they should have been capitalized as part of the cost. Even the county's own expert witness testified that he felt the engineering charges were reasonable and proper and should be included in the rate base.
On this appeal, the only argument made by the county in support of its position is that the utility, by failing to include the engineering overheads in its rate base in previous years, has acquiesced in this exclusion and cannot now complain. We cannot see how acquiescence can preclude Florida Cities from adding these items to its rate base, since the only parties injured by the failure to include them in previous years are Florida Cities and its predecessor companies. A public utility is entitled to a fair return upon its investment. Keystone Water Company, Inc. v. Bevis, Fla. 1973, 278 So.2d 606. Since all of the evidence demonstrates that the engineering overheads were properly includable in the rate base, it was incumbent upon the Board to add these items. See Florida Crown Util. S., Inc. v. Utility Regulatory Bd., Fla.App. 1st, 1973, 274 So.2d 597.

Contributions in Aid of Construction
The Board declined to include the cost of certain water and sewer facilities in Florida Cities' rate base because they were deemed to be contributions in aid of construction. These particular water and sewer facilities had originally been built by a company in the land developing business and conveyed to the utility companies ultimately purchased by Florida Cities in exchange for stock in those companies. The owners of the land development company were also the owners of the predecessor utility companies, and these were the persons who ultimately sold their stock in the utility companies to Florida Cities. In the contracts for the purchase by Florida Cities of the stock of these utility companies, the sellers were required to specify all advances or contributions in aid of construction made by customers or prospective customers. The cost of the water and sewer facilities in question was not so specified. *624 Nevertheless, the Board construed the cost of these facilities to be contributions in aid of construction and left it out of the rate base. However, the Board did grant some relief by permitting Florida Cities to include within its rate base some additional expenses incurred as a result of the purchase of the stock of the predecessor utilities.
Florida Cities contends that since the water and sewer facilities in dispute were furnished by a corporation owned by the same parties who owned the utility companies in exchange for stock in those companies, the cost of such facilities was equivalent to stockholders' equity which should be included in the rate base. Florida Cities poses the question of whether the Board would have treated the cost of these facilities differently "if the prior owners had sold themselves stock for cash and then have the utilities pay the same money back for the cost of the plant."
In recent years, a number of similar disputes have occurred in other jurisdictions. The position taken by the Board in the instant case has been sustained almost without exception. In Killarney Water Co. v. Illinois Commerce Com'n, 1967, 37 Ill.2d 345, 226 N.E.2d 858, the court held that where a land developer transferred a certain portion of the purchase price of each lot to his companion utility company for the purpose of building a water plant, such funds were contributions in aid of construction rather than stockholder investment since it would be unfair to require the consumers to pay rates based upon the value of a facility for which they themselves have already paid. In Du Page Utility Co. v. Illinios Commerce Com'n, 1971, 47 Ill.2d 550, 267 N.E.2d 662, the Illinois court reached the same conclusion on substantially similar facts. See also State ex rel. Util. Com'n v. Heater Util., Inc., 1975, 288 N.C. 457, 219 S.E.2d 56; State ex rel. Utilities Com'n v. Heater Utilities, 1975, 26 N.C. App. 404, 216 S.E.2d 487; City of Hagerstown v. Public Service Commission, 1958, 217 Md. 101, 141 A.2d 699.
In rejecting the contention that the cost of utilities constructed by a real estate development company and thereafter transferred to its companion utility company should be included in the rate base of the utility, the court in State ex rel. Valley Sewage Co. v. Public Serv. Com'n, Mo. App. 1974, 515 S.W.2d 845, 850, noted:
"... Thus, the truly significant question in this case is posed. Was the `value of the property actually used in the public service' properly weighed by deducting therefrom contribution by customers and users of the Company in aid of construction in the amount of $242,817.00? The answer to this query, for several reasons, is yes. To force the customers and users of a utility to pay rates predicated upon the value of a facility which they themselves substantially paid for, as is the case here, is the antithesis of a just and reasonable rate. Conversely, where the customers and users of a utility have substantially paid for the facilities employed in the public service, the antithesis of a just and reasonable rate is one that would permit a utility's stockholders to recover a return on money which they, in fact, never invested... ."
In response to the suggestion that since the same persons owned both the construction company and the utility company, the monies expended by the construction company in building the plant should be treated as stockholder equity, the court said at page 851:
"The fourth ground for relief asserted by the Company is, to say the least, innovative. The thrust of the Company's fourth ground appears to be that no contributions in aid of construction were ever made to the Company because it and Freeman Construction, by virtue of common ownership and officers, were `one and the same'. The Company then *625 conveniently assumes, without aid or force of logic, and absent factual or legal support, that what the Commission treated as contributions in aid of construction to the Company actually consisted of property acquired from capital expenditures made by Freeman Construction; thus, no contributions, in fact, were ever made to the Company. The Company's assumption is as false as it is convenient, and can be fairly characterized as a technical argument at best. As heretofore noted, the Company's original plant, in the final analysis, was built from funds that emanated from its customers and users, and not, in reality from funds of Freeman Construction... ."
See also Re Green-Fields Water Co., N.J. 1964, 53 PUR 3d 670, in which, as here, the fact that the companion development company took stock of the utility in exchange for the water mains was not such a circumstance as would take these assets out of the category of being a contribution in aid of construction.
In the final analysis, all of these cases turn upon the fact that where the property owners who are served by the utility have, in effect, paid for constructing the facilities, the cost of such construction should not be permitted to be included within the rate base for purposes of determining the rates to be charged these customers. As stated in City of Hagerstown v. Public Service Commission, supra, at page 702:
"... We think that it makes no difference, so far as this case is concerned, whether these payments were made in the first instance by the developers or by the purchasers of lots. We may observe in passing that we have no doubt that any such costs originally paid by the developers were passed on to the purchasers in the form of increased prices for lots, and that the purchasers or their successors in interest are the persons who must pay the water rates."
In the instant case, the record is not clear with respect to where the money came from to build the facilities in question. However, since the developer and the utility had a common ownership and the utility serviced the lots being developed by the developer, a reasonable inference may be drawn that the source of these monies came from the sale of the lots. In any event, Florida Cities did not show that the cost of these facilities came from new money invested by the original stockholders of the developer and the utility. The fact that for a number of years the predecessor utilities had carried these facilities on their books as contributions in aid of construction and took no depreciation upon such facilities for tax purposes lends support to the Board's ruling. Since there is competent substantial evidence to support the conclusion of the Board on this point, it must stand. Florida Rate Conf. v. Florida Railroad & P.U. Com'n, Fla. 1959, 108 So.2d 601.

Accrued Depreciation
Florida Cities had been depreciating its plant at a composite rate of 1.35%. By its own admission, the depreciation was understated. In 1971 an engineering firm hired to review the depreciation rates recommended that they be raised to a composite rate of 1.6%. One of the men directly responsible for the preparation of this study testified concerning the reasonableness of a 1.6% rate. However, the county's certified public accountant testified that the assets should have been depreciated at a composite rate of 3.3%. The Board accepted this recommendation and applied the 3.3% depreciation rate retroactively against the life of the assets.
First, Florida Cities contends that the question of determining a proper depreciation rate is really an engineering question rather than an accounting question and that its engineering firm's recommendation should have been accepted. The *626 county responds by asserting that its witness was a well qualified utility rate consultant and further that his recommendations were reviewed and confirmed by the county engineer who had inspected the facilities several years ago. We believe that Florida Cities' argument goes to the weight of the evidence rather than to its competency. Since there is evidence to support the 3.3% rate, this holding will not be disturbed.
Finally, Florida Cities says that, in any event, the increased depreciation rate should not be retroactively applied. In support of this argument, Florida Cities cites an accounting principle to the effect that where depreciation rates are changed, it is not advisable to apply them retroactively because to do so may suddenly cause too large an impact on the financial position of the company. However, the county's expert witness pointed to another accounting principle which indicates that there are often differences between the application of generally accepted accounting practices to nonregulated as contrasted to regulated businesses because of the effect on the rate-making process in regulated businesses. He gave his expert opinion that the increased depreciation should be applied retroactively, and we cannot say it was error to do so. It should be noted that throughout its presentation, Florida Cities has wanted to stand in the shoes of its predecessor companies for purposes of carrying forward an increased rate base. Therefore, it does not seem unfair to apply against the cost figures of the predecessor companies a depreciation rate which has now been determined to be the one which should have been used all along.
The order is affirmed except to the extent that it approves the exclusion of the engineering overheads from the rate base. The court is directed to enter an order requiring the Board to include the engineering overheads.
McNULTY, C.J., and SCHEB, J., concur.