836 P.2d 73

In the Matter of the Application of TIM-
BERON WATER COMPANY, INC. for
a Water Rate Increase Pursuant to Ad-
vice Notice No. 4.

Daniel J. BEHLES, as Trustee in
Bankruptcy for the Timberon
Water Co., Inc., Appellant,

v.

NEW MEXICO PUBLIC SERVICE
COMMISSION, Appellee.

No. 20109.

Supreme Court of New Mexico.

Aug. 5, 1992.

Behles–Giddens, P.A., Geraldine E. Rivera, Albuquerque, for appellant.

Lee W. Huffman, Com'n Counsel, Mercedes Fernandez, Staff Counsel, Santa Fe, for appellee.

Burroughs & Rhodes, Randolph Burroughs, Alamogordo, for Timberon Water and Sanitation Dist., Timberon Property Owners Ass'n.

## OPINION

FROST, Justice.

Daniel J. Behles (Behles), as Trustee in bankruptcy for the Timberon Water Company (Timberon), appeals the final order of the New Mexico Public Service Commission (Commission) in case no. 2355, dated August 26, 1991, that denied his requested rate increase for Timberon. Behles contends 1) that the Commission's exclusion of Contributions in Aid of Construction (CIAC) was unreasonable and unlawful and unsupported by substantial evidence, 2)

that federal bankruptcy law preempts the Commission's use of the CIAC doctrine, 3) that he is a bona fide purchaser under § 544 of the Bankruptcy Code, able to void the CIAC designation, 4) that the lower-than-requested rate increase amounts to a confiscation of property without due process of law, and 5) that First National Bank in Alamogordo (FNBA) would be prohibited by federal law from operating the water company if it bids its interest in Timberon at a foreclosure sale. We disagree with Behles' contentions and affirm the Commission's final order.

## I.

North American Land Development (NALD) sold lots for vacation homes near Cloudcroft, New Mexico. As part of the development, NALD built a water system, which Timberon, a wholly owned subsidiary of NALD, was operating by 1971. NALD, later known as North American Development (NAD), is now succeeded in interest by Republic Financial Group (Republic).

In 1983, in Commission case no. 1746, the Commission granted Timberon a Certificate of Public Convenience and Necessity and authorized Timberon to charge rates for water. In the years previous to this order, Timberon had not charged its customers for water.

In 1986, Johnny Mobley, president of NAD and Timberon executed a promissory note in favor of FNBA for $1,750,000. FNBA secured the promissory note with a mortgage on the land, water rights, and distribution system of Timberon.

In 1988, FNBA filed a foreclosure action against NAD, Timberon, and Mobley in state district court on the 1986 mortgage. Subsequently, Timberon and Republic filed under Chapter 11 of the U.S. Bankruptcy Code. The foreclosure action was removed to the Bankruptcy Court. FNBA and Behles reached an agreement as to the foreclosure action, and the Bankruptcy Court approved the settlement.

In March of 1990, the Commission staff petitioned the Commission to investigate Timberon's quality of service and the propriety of the promissory note and mortgage. The Commission docketed the investigation as case no. 2319.

In September of 1990, Timberon, managed by Behles, filed a petition for a rate increase. The Commission consolidated the investigation case and the rate case into case no. 2355, the case now on appeal. Behles sought an increase in excess of 100% from $106,289 to $224,753 in revenue to allow for a profit of $51,870. In August of 1991, the Commission granted a rate increase that provided for an 11.34% rate of return, increasing revenue to $119,795 and allowing for a $2,526 profit. To determine the 11.34% rate of return, the Commission excluded $2,245,186 from the rate base as CIAC.

## II.

■ Behles attacks several findings made by the Commission, all of which we will review according to the same following standard. The burden is on the party appealing, in this case Behles, to show that the Commission order is unreasonable or unlawful. NMSA 1978, § 62–11–4 (Repl.Pamp.1984); *Maestas v. New Mexico Public Serv. Comm'n*, 85 N.M. 571, 574, 514 P.2d 847, 850 (1973). This Court's review of Commission decisions is limited to: "the question of whether the Commission acted fraudulently, arbitrarily or capriciously, whether the decision is supported by substantial evidence, and, generally, whether the actions of the Commission are within the scope of its authority." *Attorney General of N.M. v. New Mexico Public Serv. Comm'n*, 101 N.M. 549, 553, 685 P.2d 957, 961 (1984). Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* For administrative agencies, arbitrary and capricious action has been defined " 'as willful and unreasonable action, without consideration and in disregard of facts or circumstances.' " *McDaniel v. New Mexico Bd. of Medical Examiners*, 86 N.M. 447, 449, 525 P.2d 374, 376 (1974) (quoting *Smith v. Hollenbeck*, 48 Wash.2d 461, 294 P.2d 921 (1956)).

■ This Court must review the whole record and "must view the evidence in the light most favorable to the decision made by the Commission." *Attorney General of N.M. v. New Mexico Public Serv. Comm'n,* 101 N.M. at 553, 685 P.2d at 961. In addition, we must always keep in mind that "the Commission is vested with considerable discretion in determining the justness and reasonableness of utility rates." *Id.* A reviewing court may not substitute its judgment for that of the Commission. *Public Serv. Co. of N.M. v. New Mexico Public Serv. Comm'n,* 92 N.M. 721, 722, 594 P.2d 1177, 1178 (1979).

■ First, Behles contends that the Commission's exclusion of $2,245,186 from the rate base as CIAC was arbitrary and unreasonable, and unsupported by substantial evidence. To the contrary, we find that substantial evidence supported the Commission's decision to exclude $2,245,186 from the rate base as CIAC.

The Commission has established a policy that CIAC, as cost-free capital to the utility, should be deducted from the rate base for rate making purposes. *In re Gas Co. of N.M.,* 21 Pub.Util.Rep.4th (PUR) 159, 172–73 (1977); *In re Public Serv. Co. of N.M.,* 82 Pub.Util.Rep.3d (PUR) 362, 369–70 (1970). The specific result of the application of the Commission's CIAC rule is to prohibit the allowance of depreciation on contributed property. The rationale for this policy is that depreciation is designed to permit a utility to recoup its investment in plant, but where there is no investment because the property has been contributed, there is nothing to be recovered.[1] Other jurisdictions agree with this analysis. The Supreme Court of Illinois noted that "it would be unfair to require such consumers [those that have contributed CIAC] to pay rates based upon the value of a facility for which they have themselves already paid."

*Du Page Utility Co. v. Illinois Commerce Comm'n,* 267 N.E.2d 662, 664 (Ill.) (per curiam), *cert. denied,* 404 U.S. 832, 92 S.Ct. 74, 30 L.Ed.2d 62 (1971). Behles concedes the wisdom in this reasoning and does not contest that its application is appropriate. Rather, he contends that the money used to build the system was not contributed at all, and that the Commission arbitrarily and unreasonably characterized the "contributions" as CIAC.

Because the Commission had taken administrative notice of case no. 1746, the testimony from that case was available to the Commission for the ratemaking purposes of this case. Based in part on that testimony, the Commission found that the funds to build the water system were contributed. In that original ratemaking case, Mobley testified that the money to build the $3.75 million water system came from the sale of real estate lots. Furthermore, Mobley testified specifically that NALD was the source of funds for the water system, and that these funds were a contribution from NAD. He said that everything was "free and clear in the water company." Mobley also agreed that the water system "definitely" improved the value of the lots for the purpose of sale. In addition, the record showed that the customers paid for the meters and their installation. Even Behles admitted that the only source of funds for the construction of the water system was NALD.

In *Florida Cities Water Co. v. Board of City Commissioners,* 334 So.2d 622, 625 (Fla.Dist.Ct.App.), *appeal dismissed,* 341 So.2d 1081 (1976), under a similar set of circumstances, the court affirmed the CIAC designation reasoning that "a reasonable inference may be drawn that the source of these monies [to fund the water system] came from the sale of the lots." The court adopted the view that the costs

---

1. This rationale becomes significant when rates are based on an "original cost" valuation of the utility. In case no. 1746, the Commission ordered that in future cases involving Timberon all rate based calculations were to be based on an "original cost" valuation. NMSA 1978, § 62–6–14(A) (Repl.Pamp.1984) provides that in arriving at a valuation of the property or business of a utility that several factors shall be considered including "the original cost thereof * * *." The Commission is not limited to any particular method of valuation in determining the rate base. *New Mexico Indus. Energy Consumers v. New Mexico Public Serv. Comm'n,* 104 N.M. 565, 569, 725 P.2d 244, 248 (1986).

were most definitely passed on to the customers in the form of increased lot prices. *Id.* Consistent with such reasoning, the Commission in the instant case reasonably concluded that Timberon customers paid for the installation of the water system when they bought their lots and should not have to pay for the system again through rate payments. Likewise, the Commission could have reasonably concluded that Timberon should not be able to earn a rate of return on the lot purchaser's money.

In his concurring opinion in *Jersey Central Power & Light Co. v. Federal Energy Regulatory Commission*, 810 F.2d 1168, 1192 (D.C.Cir.1987), Circuit Judge Starr described the proper role of a reviewing court: "Our limited but vital role is to ensure that the end result of a rate order reasonably balances investor and ratepayer interests." Moreover, "[t]he economic judgments required in rate proceedings are often hopelessly complex and do not admit of a single correct result." *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 314, 109 S.Ct. 609, 619, 102 L.Ed.2d 646 (1989). In making its decision, we believe that the Commission properly balanced the investor and ratepayer interests, thereby achieving one of several possible "correct" results. For these reasons, the Commission's decision to deduct $2,245,186 from the rate base as CIAC is reasonable and is supported by substantial evidence.

■ Behles also contends that the hearing examiner's decision from case no. 1746, characterizing the contributions as CIAC, was improperly and unreasonably adopted as the decision in this case on the principle of res judicata. Citing *Hobbs Gas Co. v. New Mexico Public Serv. Comm'n*, 94 N.M. 731, 736, 616 P.2d 1116, 1121 (1980), he asserts that the application of res judicata was error, and that even if it was not error, evidence of changed circumstances should have barred its effect.

Behles' argument is misplaced because the decision in this case was not based on the decision, but the evidence, from case no. 1746. None of the testimony used from case no. 1746 would be rendered inapplicable by changed circumstances. For exam-

ple, nothing will change the fact that, as Mobley testified, the funds from the sale of the real estate were used to build the water system. For this reason, we find that the Commission's use of the record in case no. 1746 was reasonable and was not affected by changed circumstances.

■ Finally, Behles contends that the operation and maintenance increase granted by the Commission should have been greater given the Commission's reason for granting the increase. The Commission based its decision on 1990 and 1991 annual reports of three New Mexico water utilities comparable to Timberon and, in so doing, increased the rate from the requested $253 per customer to $277 per customer. This action reflects neither arbitrary or unreasonable action nor a lack of substantial evidence.

### III.

Behles contends that federal bankruptcy law preempts the Commission's use of the CIAC doctrine. He asserts that the low rate set by the Commission due to the exclusion of CIAC does not provide sufficient revenue to support operation, maintenance, and a return on investment without a subsidy. He contends that these circumstances impair effective reorganization, thereby infringing on federal bankruptcy law.

■ Congress certainly has the constitutional prerogative under its Bankruptcy power to preempt the States, even in their exercise of police power, but Congressional intent to do so will not be inferred lightly. *Penn Terra Ltd. v. Department of Envtl. Resources*, 733 F.2d 267, 272 (3rd Cir.1984). Preemption must be explicitly mandated by Congress, compelled due to an unavoidable conflict between the state law and the federal law, *Id.*, or compelled because the state law is an obstacle to the full accomplishment of congressional objectives. *Perez v. Campbell*, 402 U.S. 637, 649, 91 S.Ct. 1704, 1711, 29 L.Ed.2d 233 (1971). "The police power of the several states embodies the main bulwark of protection by which they carry out their responsibili-

ties to the People; its abrogation is therefore a serious matter." *Penn Terra,* 733 F.2d at 273. Statutes derived from the state's police power "should not be overridden by federal legislation unless they are inconsistent with explicit congressional intent." *Id.*

■ The Commission's authorization to set rates for utility companies is clearly set forth in the Public Utilities Act promulgated pursuant to this state's police power. NMSA 1978, § 62–3–1 (Repl.Pamp.1984); *In re Jal Gas Co.,* 44 B.R. 91, 94 (Bankr. D.N.M.1984). We may not disturb this important police power unless its effect conflicts with specific congressional bankruptcy objectives. Behles claims that federal bankruptcy objectives regarding reorganization have been disturbed, but we believe that Congress statutorily provided for regulatory and police power proceedings knowing full well that reorganization might be affected. In other words, we believe the primary congressional objective was to continue regulatory proceedings even against debtors in reorganization.

The Bankruptcy Code reflects these congressional objectives. Title 11 U.S.C. § 362(a) of the 1988 Bankruptcy Code provides for the automatic stay of administrative proceedings against a debtor, but § 362(b)(4)–(5) excepts police and regulatory proceedings from the stay. The pertinent portions of the Bankruptcy Code are as follows:

> (b) The filing of a petition under section 301, 302, or 303 of this title * * * does not operate as a stay—
>
>    *    *    *    *    *    *
>
> (4) * * * of the commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power;
>
> (5) * * * of the enforcement of a judgment, other than a money judgment, obtained in an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power;

11 U.S.C. § 362(b)(4)–(5) (1988). Thus, in § 362(b)(4)–(5), Congress expressly provided for the exercise of a state's regulatory power, such as exercised by the Commission in its ratemaking function. Furthermore, 28 U.S.C. § 959(b) (1988), which requires the trustee to "manage and operate the property in his possession * * * according to the requirements of the valid laws of the State," bolsters the view that the Bankruptcy Code was not intended to preempt state regulatory law. *Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Protection,* 474 U.S. 494, 505, 106 S.Ct. 755, 761, 88 L.Ed.2d 859 (1986). Neither statute indicates that the stay should be reinstituted in the event that the regulatory action interferes with the debtor's property, and courts reject any such interpretation. *Eddleman v. United States Dep't of Labor,* 923 F.2d 782, 790 (10th Cir.1991); *Penn Terra,* 733 F.2d at 278.

For example, in *Beker Industries Corp. v. Florida Land & Water Adjudicatory Commission (In re Beker Industries Corp.),* 57 B.R. 611, 623 (Bankr.S.D.N.Y. 1986), a Florida regulatory Commission limited the plaintiff's trucking of phosphate ore to 1.2 million tons, substantially below the 1.68 million tons that it had produced in 1985. The plaintiff debtor applied for a stay of the continuation and enforcement of this proceeding which the bankruptcy court denied. *Id.* at 624. Relying on § 959, the court noted that "the Code does not change the business and regulatory environment in which a debtor operates." *Id.* The court further noted that "[a]n ongoing business is not to be given a competitive edge merely by virtue of its attempt to reorganize under Chapter 11." *Id.* Behles is requesting exactly that, a competitive edge. Every other utility receives rates wherein CIAC has been excluded from the rate base when appropriate. It would be unfair to allow a bankrupt utility, because of its bankruptcy, to receive a rate of return based on capital the ratepayers have contributed.

■ We agree that administrative proceedings not characterized as regulatory or police power proceedings would not be excepted from the stay under § 362, and thus would be preempted by the Bankruptcy Code. To determine whether an agency

action is preempted by the Bankruptcy Code, courts often apply two tests: the "pecuniary interest" test and the "public policy" test. These tests distinguish between agency actions that are regulatory and thus necessary to protect the public interest under the state's police power and those agency actions that are not regulatory. *Eddleman,* 923 F.2d at 791. Under the "pecuniary purpose" test the court will enforce the stay if the proceeding attempts to protect pecuniary interests in the debtor's property rather than implement some aspect of public policy. *Id.* The court will also enforce the stay under the "public policy" test if the proceeding attempts to adjudicate private rights rather than implement public policy. *Id.* An example of this differentiation can be seen in *In re Jal,* where the New Mexico Commission ordered a debtor gas company to reimburse its customers for an overpayment through lower gas rates over a set period of time. *In re Jal,* 44 B.R. at 92–93. The Commission asserted that it was fulfilling its "ratemaking" duty. *Id.* After finding that the "ratemaking" label was not determinative, the court held that:

> Regardless of what [the Commission] calls their administrative function in this matter, courts have consistently distinguished governmental actions which attempt to obtain a pecuniary advantage from those which attempt to further the public welfare. The [Commission] is also attempting to preempt the United States Bankruptcy Code by forcing Jal Gas Company to pay a prepetition debt in a manner preferential to all of the other prepetition creditors of Jal Gas Company.

*Id.* at 94. Because their action was not regulatory in nature, the court found that the Commission was in violation of the automatic stay provision of § 362. *Id.* In effect, if the action of the Commission falls primarily within the definition of "police or regulatory action," then preemption may not be found, for Congress has in essence pre-approved the action. In the case at hand, the Commission is not using its ratemaking function as a precept to force the debtor to pay a prepetition debt. The Commission merely used the doctrine, accepted here and in numerous other jurisdictions, that excluded CIAC from the utility's rate base. The Commission did not impose a hidden judgment or liability and did not adjudicate a private right. The Commission's action falls squarely within the definition of "police or regulatory" and thus within the exception to the § 362 stay.

Behles cites two New Hampshire Bankruptcy cases in support of his position. Neither are applicable to the circumstances present here. In one case, the court concluded that express preemption was intended by §§ 1123(a)(5) and 1129 of the Bankruptcy Code regarding restructuring. *Public Serv. Co. of N.H. v. State of N.H. (In re Public Serv. Co. of N.H.),* 108 B.R. 854, 883 (Bankr.D.N.H.1989). The preemptive effect was that a plan of reorganization could not be disapproved by a state regulatory agency once confirmed by a court under § 1129. *Id.* The distinguishing factor is that neither § 1123(a)(5) nor § 1129 has been contended to be preemptive in this strictly regulatory, ratemaking case. In the other New Hampshire Bankruptcy case, the court granted a preliminary injunction under § 105 of the Bankruptcy Code to prevent an involuntary rate case. *Public Serv. Co. of N.H. v. State of N.H. (In re Public Serv. Co. of N.H.),* 98 B.R. 120 (Bankr.D.N.H.1989). The court was unsure whether an automatic stay would apply under § 362, and it did not explore these possibilities. *Id.* at 125. In any event, its analysis had nothing whatsoever to do with preemption, and so is not helpful to us in our analysis on that point.

After studying the relevant case and statutory law, we believe that Congress in no way intended to preempt the ratemaking proceedings of this case, or the widely accepted CIAC doctrine used as part of the calculation of a fair rate of return. In fact, we believe that Congress specifically provided for this sort of standard ratemaking proceeding in § 362(b)(4)–(5), which excepts police and regulatory proceedings from the automatic stay. For these reasons, we reject Behles' preemption argument.

## IV.

Behles further contends that he has stepped into the shoes of a bona fide purchaser as the trustee and that pursuant to § 544 of the Bankruptcy Code he may void the Commission's CIAC designation; thereby including the capital in Timberon's rate base. We disagree.

The relevant portions of § 544 read as follows:

(a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—

\*       \*       \*       \*       \*       \*

(3) a bona fide purchaser of real property \* \* \*

11 U.S.C. § 544 (1988). Behles does not cite any support for his novel proposition that the effect of the CIAC doctrine is "voidable," creates an "obligation," or effectuates a "transfer," as defined by § 544; and furthermore, we find this characterization to be a stretch of common sense and reason. This Court will not review an issue unsupported by authority. *Roselli v. Rio Communities Serv. Station, Inc.,* 109 N.M. 509, 512, 787 P.2d 428, 431 (1990).

## V.

Behles also claims that the lower-than-requested rate increase amounts to a confiscation of property without due process of law.

As the Commission recognized in its final order, the New Mexico Public Utility Act requires that the public utility rates be just and reasonable. NMSA 1978, § 62–8–1 (Repl.Pamp.1984). This is also the test for determining the point at which a rate has become unconstitutionally confiscatory. *Jersey Central,* 810 F.2d at 1175. The Commission "is vested with considerable discretion in determining the justness and reasonableness of utility rates." *Attorney General v. New Mexico Public Serv. Comm'n,* 101 N.M. 549, 553, 685 P.2d 957, 961 (1984). To set a just and reasonable rate, the Commission must balance the investor's interest against the ratepayer's interest. *State v. Mountain States Tel. & Tel. Co.,* 54 N.M. 315, 338, 224 P.2d 155, 170–71 (1950); *cf. Federal Power Comm'n v. Hope Natural Gas Co.,* 320 U.S. 591, 603, 64 S.Ct. 281, 288, 88 L.Ed. 333 (1944) (holding that under federal Natural Gas Act, Federal Power Commission may set just and reasonable rate by balancing interests of investors and consumers). There is a significant zone of reasonableness, then, between utility confiscation and ratepayer extortion. *Mountain States,* 54 N.M. at 338, 224 P.2d at 170–71.

The Commission could reasonably have found that inclusion of CIAC in the rate base would have resulted in an unfair rate. As explained in some detail in Section II, *supra,* the ratepayers in effect paid for the water system when the developer used a portion of the proceeds from lot sales to build the system. The ratepayers should not have to pay rates on capital that they contributed.

Furthermore, the Commission found that the bad condition of the system reflected a misuse of the operating revenue generated in the past. In effect, Behles urges that retroactive rates be instituted to make up for this past neglect and misuse of funds. The Decision of the Hearing Examiner adopted by the Commission explains that rates are designed to generate revenue for the cost of the utility service, and are not designed to raise capital for deferred maintenance. In other words the Commission's function is to set *prospective* rates only. *Mountain States Tel. and Tel. Co. v. New Mexico State Corp. Comm'n,* 90 N.M. 325, 341, 563 P.2d 588, 604 (1977).

We believe the Commission has set just and reasonable prospective rates falling within the zone of reasonableness which reflect the cost of service supplied by the Timberon Water Co. The Commission did not infringe upon the trustee's constitutional rights.

## VI.

■ Behles contends that FNBA would be prohibited by federal law from operating the water company if it bids its interest in Timberon at a foreclosure sale. A decision on the propriety of a bid for Timberon by FNBA and its possible subsequent operation of Timberon would be an advisory opinion at this juncture. We do not give advisory opinions. *Bell Tel. Lab., Inc. v. Bureau of Revenue*, 78 N.M. 78, 84, 428 P.2d 617, 623 (1966), *appeal dismissed*, 388 U.S. 457, 87 S.Ct. 2111, 18 L.Ed.2d 1318 (1967); *State v. Castrillo*, 112 N.M. 255, 258, 814 P.2d 123, 126 (Ct.App.), *appeal decided*, 112 N.M. 766, 819 P.2d 1324 (1991).

Based upon the views expressed herein, we affirm the final order of the Commission.

IT IS SO ORDERED.

BACA and MONTGOMERY, JJ., concur.