2001-NMSC-015

22 P.3d 1188

Carla SONNTAG, Plaintiff–Appellee,

v.

Jerry H.J. SHAW and Shaw and
Associates, Inc., Defendants–
Appellants.

No. 25,964.

Supreme Court of New Mexico.

April 19, 2001.

Villella, Skarsgard & Noya, Ltd. Co., Charles Noya, Albuquerque, NM, for Appellants.

Foster, Johnson, McDonald, Lucero, Koinis, L.L.P., J. Douglas Foster, Kathryn D. Lucero, Albuquerque, NM, for Appellee.

Modrall, Sperling, Roehl, Harris & Sisk, P.A., Lisa Mann, Albuquerque, NM, for Amicus Curiae New Mexico Defense Lawyers Association.

## OPINION

FRANCHINI, Justice.

{1} Plaintiff Carla Sonntag sued an Albuquerque corporation, Shaw and Associates, Inc. (the Corporation) and its owner, Jerry Shaw for discrimination under the New Mexico Human Rights Act (NMHRA), NMSA 1978, §§ 28–1–1 to –15 (1969, as amended through 2000), and for breach of contract. *See* NMSA 1978, § 28–1–13(C) (1987) (providing that the district court's judgment is "subject to further appeal to the supreme court"). She claimed that because of her gender she earned less than similarly situated male managers of a subsidiary corporation in Scottsdale, Arizona and San Diego, California, and that Defendants breached a contract to repurchase her stock in the company. At trial, the jury found for Plaintiff and awarded her $206,416 for her discrimination claim and $63,607 for her breach of contract claim. On appeal, Defendants argue that the jury's verdict in favor of Plaintiff on her discrimination claim must be reversed because: (1) the trial court erred in allowing the president of the corporation to be sued in his personal capacity; (2) the trial court erred in allowing Plaintiff to compare her wages with those of the Scottsdale and San Diego managers; (3) the trial court erred in refusing to give a number of Defendants' requested instructions to the jury; (4) the discrimination claim was unsupported by the evidence; and (5) the evidence did not support the amount of damages awarded by the jury for the discrimination claim. With regard to the breach of contract claim, Defendants urge this Court to reverse the trial court on the grounds that: (6) the jury was improperly instructed; (7) Plaintiff's breach of contract claim is not supported by the evidence; (8) the amount of damages awarded by the jury was excessive; and (9) Shaw should not be individually liable for the breach of contract.

{2} We hold that: (1) Mr. Shaw, the president of the Corporation, is not personally liable under the NMHRA because, while Plaintiff exhausted her administrative remedies against the Corporation, she failed to do so against Mr. Shaw individually; (2) the trial court properly allowed Plaintiff to compare her wages with those of the Scottsdale and San Diego managers; (3) the trial court properly instructed the jury with regard to the discrimination claim; (4) Plaintiff's discrimination claim was supported by the evidence; (5) the NMHRA damages were not excessive; (6) the instructions given to the jury on the breach of contract claim did not constitute reversible error; (7) Plaintiff's breach of contract claim was supported by the evidence; and (8) the breach of contract damages were excessive. We do not address Shaw's final claim because he has failed to provide this Court with citations to relevant authority and has not argued this issue with sufficient particularity. *See* Rule 12–213(A)(4) NMRA 2001; *see also Roselli v. Rio Cmtys. Serv. Station, Inc.*, 109 N.M. 509, 512, 787 P.2d 428, 431 (1990) ("We will not review this issue since it was briefed without cited authority."). We affirm the judgment of the trial court and remand to the trial court to determine a proper amount of contract damages.

## I. FACTS AND PROCEDURE

{3} In April of 1992, Shaw and Associates, Inc., a New Mexico corporation that offers surety bonds to contractors, hired Carla Sonntag. Ms. Sonntag joined Jerry Shaw, the president of the Corporation, and four other employees at the Albuquerque office. Sonntag had never worked in the surety bond business, but she possessed a bachelor's degree in business administration, had significant experience in management and accounting, and was familiar with the construction industry.

{4} Although Shaw referred to Plaintiff as the manager of the Albuquerque branch, the two parties disagree as to whether she actually managed the office. It is undisputed that Plaintiff was the lead underwriter of bonds for the Albuquerque office, that she handled more accounts than anyone at that office, and that she maintained the files and analyzed the financial statements. Plaintiff

testified that, in addition to these duties, she was responsible for supervising all but one division of the Corporation's Albuquerque staff, for hiring and terminating employees, and for generating new business. Various employees testified that they considered Plaintiff to be the manager of the Albuquerque office.

{5} The Corporation owns all of the stock in an Arizona subsidiary called Jerry Shaw and Associates, Inc., with offices in Scottsdale, Arizona, and San Diego, California. Mr. Shaw signed documents representing the Scottsdale and San Diego offices as "branch offices" of the Corporation, but denied that these two offices were branches at trial. Mr. Shaw testified that through his majority ownership of the Corporation, he exercises control over the subsidiaries. The Albuquerque and Scottsdale offices use a single networked computer system, file a single consolidated tax return, and are part of a single retirement plan.

{6} In 1994, the Scottsdale and San Diego offices were managed by males earning $40,000 and $80,000 respectively. Plaintiff's salary was $25,500. In 1995, the manager of the Scottsdale office was fired, and his replacement hired for a salary of around $60,000. In the meantime, Plaintiff's salary was increased to $35,000.

{7} In addition to their salaries, the Corporation offered the managers stock in the company. According to Plaintiff, unlike the other managers who she claimed were promised ten percent immediately, Mr. Shaw instead promised her that she would accumulate one percent of the outstanding shares in the company per year for up to ten years. Plaintiff also testified that Mr. Shaw promised to repurchase the stocks she accumulated when she left, regardless of the reason for her departure. Mr. Shaw testified that any payment for stock to Plaintiff was subject to an unwritten stockholder's agreement that precluded payment to a stockholder who, like Plaintiff, took the Corporation's customers with her to her new job. The Corporation did not buy back Plaintiff's shares. The Corporation did buy back the shares of the Scottsdale manager who was fired even though Mr. Shaw knew that he had taken accounts from the Scottsdale office to his new position.

{8} Naming only the Corporation as a defendant, Plaintiff filed a discrimination claim with the New Mexico Human Rights Division, complaining of harassment and wage discrimination based on sex. Pursuant to the NMHRA, Plaintiff timely appealed from the Division's Order of Nondetermination. *See* NMSA 1978, §§ 28–1–10(D) (1995), –13(A). Plaintiff filed suit against the Corporation and Mr. Shaw, individually, alleging that Defendants: (1) discriminated against her on the basis of her sex in violation of NMSA 1978, §§ 28–1–7 and 28–1–13; (2) breached their contractual agreement to repurchase her stock once she left the corporation; and (3) oppressed a minority shareholder in violation of NMSA 1978, § 53–16–16 (1967) by excluding her from the profits of the Corporation and refusing to purchase her stock. Defendants filed a counterclaim which is not a subject of this appeal.

{9} Prior to trial, Defendants filed a motion for summary judgment, arguing that, as a matter of law, Plaintiff's discrimination claim must fail because she could not compare her wages to those of the Scottsdale and San Diego managers since those managers were employed by a subsidiary corporation. The trial court denied the motion on the grounds that material issues of fact existed. In addition, Defendants objected to the trial court's refusal to give the jury fourteen of his fifty-three requested jury instructions. Finally, Defendants filed a motion for a judgment notwithstanding the verdict claiming, among other things, that Mr. Shaw could not be held personally liable under the NMHRA. The trial court denied that motion.

{10} The jury found in favor of Plaintiff on her discrimination and breach of contract claims, and awarded her verdicts of $206,416 and $63,607, respectively. Holding Defendants joint and severally liable, the trial court awarded Plaintiff $81,000 in prejudgment interest pursuant to NMSA 1978, § 56–8–4(B) (1993) and $53,630.67 in attorneys' fees pursuant to Section 27–1–13(D). For reasons that the record fails to explain, the shareholder oppression claim did not reach the jury.

## II. Wage Discrimination claim

■ {11} Under the NMHRA, "it is an unlawful discriminatory practice for ... an employer, unless based on a bona fide occupational qualification, ... to discriminate in matters of compensation, terms, conditions or privileges of employment against any person otherwise qualified because of ... sex." Section 28–1–7(A) (1987). In order to prevail, Plaintiff must demonstrate, by direct or indirect evidence, that the Corporation intentionally discriminated against her on the basis of her sex. *See Smith v. FDC Corp.*, 109 N.M. 514, 517–18, 787 P.2d 433, 436–37 (1990) (holding that in a race and age discrimination lawsuit, Plaintiff must demonstrate that the defendant discriminated against him or her because of his or her race or age). Defendants assert that there is no individual liability for a discrimination claim and that, in any case, Shaw is not individually liable for any alleged discrimination by the Corporation. Defendants also argue that in attempting to prove discrimination, Plaintiff was legally barred from comparing her wages with those of the Scottsdale and San Diego managers. Defendants further contend that their requested jury instructions were improperly refused, that Plaintiff's claim was unsupported by the evidence, and that the amount of damages was excessive.

### A. Individual Liability Under the NMHRA

■ {12} Defendants argue that the owner of a corporation cannot be sued in a personal capacity for a violation of the NMHRA. While Defendants cite precedent for the proposition that no personal liability exists under Title VII, they provide no such law with regard to the NMHRA. In fact, this Court has acknowledged the possibility of individual liability for discrimination claims. *Cf. Luboyeski v. Hill*, 117 N.M. 380, 382, 872 P.2d 353, 355 (1994) (affirming the dismissal of individual defendants because the plaintiff failed to exhaust administrative remedies against them); *Mitchell–Carr v. McLendon*, 1999–NMSC–025, ¶ 10, 127 N.M. 282, 980 P.2d 65 (citing *Luboyeski*). As Plaintiff suggests, the potential for individual liability for discrimination claims is rooted in the language of the NMHRA itself, which forbids "any person" from supporting a discriminatory practice. Section 28–1–7(I); *see* NMSA 1978, § 28–1–2(A) (1993) (including within its definition of "person" for purposes of the NMHRA, "one or more individuals").

[3] {13} Although we reject the proposition that there can exist no individual liability under the NMHRA, we hold that in this case, Mr. Shaw cannot be held personally liable for Plaintiff's discrimination claim. Under the NMHRA, a plaintiff must exhaust his or her administrative remedies against a party before bringing an action in district court against that party. *See Mitchell–Carr*, 1999–NMSC–025, ¶ 10, 127 N.M. 282, 980 P.2d 65 (holding that summary judgment was properly granted against NMHRA claimants seeking to hold individuals personally liable because they failed to name those individuals as respondents in their complaint to the New Mexico Human Rights Division); *Luboyeski*, 117 N.M. at 382–83, 872 P.2d at 355–56 ("Since [the plaintiff] has not gone through the administrative process that is prerequisite to suing the individual defendants under the Human Rights Act, we affirm the trial court's order dismissing those defendants"). In the present case, Plaintiff named only the Corporation as a defendant in her complaint to the Division. In neglecting to name Mr. Shaw personally, she failed to exhaust her administrative remedies against him. The trial court therefore erred in allowing Plaintiff's discrimination claim to be brought against Mr. Shaw individually.

### B. Comparing Wages with Employees of a Subsidiary

{14} Defendants filed a motion for summary judgment, arguing that Plaintiff's discrimination claim must fail because she cannot compare her earnings to those of the managers of the Scottsdale and San Diego subsidiary offices. The trial court denied the motion. On appeal, the Corporation contends that the denial of its motion for summary judgment was improper. We do not address the propriety of the trial court's interlocutory ruling and instead address the Corporation's arguments regarding this issue in our discussion of the sufficiency of evi-

dence to support the jury's verdict. *See, e.g., Gonzales v. Las Vegas Med. Ctr.,* 2000–NMSC–029, ¶ 18, 129 N.M. 586, 11 P.3d 550 ("When a case has been fully tried on the merits, an appellate court reviews the record to determine whether the evidence is sufficient to support the jury's verdict, rather than assessing the sufficiency of the prima facie case.").

## C. Jury Instructions

{15} The Corporation contends that the trial court committed reversible error with regard to the discrimination claim by failing to give the jury its requested instructions 1, 9, 12 and 14–23. We review the trial court's decision not to submit requested instructions to the jury for an abuse of discretion. *See McDowell v. Napolitano,* 119 N.M. 696, 704, 895 P.2d 218, 226 (1995). "If 'instructions, considered as a whole, fairly present the issues and the law applicable thereto, they are sufficient. Denial of a requested instruction is not error where the instructions given adequately cover the issue.'" *Id.* at 703, 895 P.2d at 225 (quoting *Hudson v. Otero,* 80 N.M. 668, 670, 459 P.2d 830, 832 (1969)). Error does not warrant the reversal of a verdict unless it is inconsistent with substantial justice or affects the substantial rights of the parties. *See Kennedy v. Dexter Consol. Sch.,* 2000–NMSC–025, ¶ 26, 129 N.M. 436, 10 P.3d 115.

{16} The record demonstrates that the Corporation's requested jury instructions appear after the jury's verdict and are not marked "given" or "refused" by the trial judge. Citing the proposition that "[i]n the absence of a record we assume that error has not been preserved," Plaintiff argues that the placement of the instructions in the record precludes review of the Corporation's claim. *Hinger v. Parker & Parsley Petroleum Co.,* 120 N.M. 430, 440, 902 P.2d 1033, 1043 (Ct. App.1995). Unlike the record in *Hinger,* the record in this case does contain the requested instructions. Moreover, the record shows that the trial court discussed the requested instructions with defense counsel prior to the retirement of the jury. The trial judge's familiarity with the Corporation's requested instructions, as expressed in his discussion with defense counsel prior to the retirement of the jury, demonstrates that these instructions were tendered in a timely fashion.

{17} The preservation of alleged error in a trial court's refusal to give a requested instruction to the jury depends on whether another instruction on the same subject matter is given. *See* Rule 1–051(I) NMRA 2001. If a party wishes to preserve for appellate review the trial court's decision to provide the jury with one instruction rather than another, that party must draw the court's attention to a specific flaw in the given instruction. *See id.; see also Sturgeon v. Clark,* 69 N.M. 132, 139, 364 P.2d 757, 761 (1961) (holding that in order to preserve error in jury instruction, objection cannot be made in mere general terms); *Andrus v. Gas Co.,* 110 N.M. 593, 597, 798 P.2d 194, 198 (Ct.App.1990) ("To preserve an issue for appellate review, the objection must be specific enough to alert the district court to the particular vice in the defective instruction."). If, on the other hand, the requested instruction addresses a matter not covered by any of the given instructions, then preservation is accomplished merely by tendering the desired instruction. *See* Rule 1–051(I).

### 1. *Requested Instructions 1, 9, 12 and 15–18*

{18} In the present case, the parties disagree as to whether the subject matter of instructions 1, 9, 12 and 15–18 were covered by other instructions. The Corporation argues that none of the given instructions addressed these proposed instructions and that it therefore preserved the claim of error by tendering the requested instructions. Plaintiff argues that the given instructions covered the Corporation's requested instructions and that the Corporation therefore had to point out specific errors in the given instructions in order to preserve the claim. Specifically, Plaintiff argues that given instruction number 2, expressing the Corporation's general denial of Plaintiff's contentions, covered requested instructions 1 and 15–18, regarding the Corporation's denial of and defenses against both Plaintiff's claims. Plaintiff argues that this general denial provided the proper instruction to the jury since the Cor-

poration's other requested instructions were not true affirmative defenses. *Cf. Archibeque v. Homrich,* 88 N.M. 527, 530, 543 P.2d 820, 823 (1975) (holding that when a defendant's position is a denial, rather than an affirmative defense, it should be stated as such in the jury instructions). Plaintiff also suggests that the Corporation's requested instructions 9 and 12, pertaining to Plaintiff's burden to show discrimination, were covered by given instruction number 6, which reads: "In order for Ms. Sonntag to prevail on her Human Rights Act claims against Shaw she has the burden of proving, by a preponderance on the evidence, that Shaw discriminated against her . . . ." We agree with Plaintiff that other instructions that were given to the jury covered requested instructions numbers 1, 9, 12 and 15–18. If the Corporation wished to replace, augment, or otherwise modify these instructions, they were required to identify on the record the specific deficiency in the given instruction. *See* Rule 1–051(I).

{19} Rather than calling the court's attention to the alleged defect in the given instructions, the Corporation merely objected generally to the trial court's failure to give its requested instructions (as with requested instructions 15–18) or failed to record any objection whatsoever (as with requested instructions 1, 9 and 12). The Corporation therefore failed to preserve any alleged error with regard to the trial court's refusal to instruct the jury on requested instructions 1, 9, 12, 15–18, and we decline to review them.

2. *Requested Instructions Numbers 14, 19–23*

 {20} The Corporation's requested instructions 14 and 19–23 concerned the corporate parent-subsidiary relationship. None of the given instructions addressed this relationship, so the Corporation's claim of error was preserved when it tendered these instructions. *See* Rule 1–051(I). As a general rule, a party is entitled to have the jury instructed on all correct legal theories of the case that are supported by substantial evidence. *See Woolwine v. Furr's, Inc.,* 106 N.M. 492, 494, 745 P.2d 717, 719 (Ct.App. 1987). According to the Corporation, requested instructions 14 and 19–23 are correct statements of the law that support its theory of the case.

 {21} Like much of the Corporation's appeal, these instructions are predicated on the theory that an employee of a parent corporation may not compare her wages to employees of a subsidiary in order to establish discrimination under the NMHRA. As noted below, the law does not support this theory. Moreover, the evidence showed that the Corporation directly controlled the wages of the relevant employees, thus obviating any need for the parent-subsidiary analysis. The Corporation's theory was not supported by the evidence, and the trial court properly refused the instructions. *See Archibeque,* 88 N.M. at 531, 543 P.2d at 824 (holding that the jury must not be instructed on "issues that are unsupported by the evidence or that present a false issue").

**D. Sufficiency of the Evidence**

 {22} The Corporation also argues that the discrimination claim is unsupported by the evidence and that the award of damages is excessive and unsupported by the evidence. "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Behles v. New Mexico Pub. Serv. Comm'n (In re Timberon Water Co.),* 114 N.M. 154, 156, 836 P.2d 73, 75 (1992). In considering a substantial evidence claim, "[t]he question is not whether substantial evidence exists to support the opposite result, but rather whether such evidence supports the result reached." *Gillingham v. Reliable Chevrolet,* 1998–NMCA–143, ¶ 14, 126 N.M. 30, 966 P.2d 197 (quoting *Las Cruces Prof'l Fire Fighters v. City of Las Cruces,* 1997–NMCA–044, ¶ 12, 123 N.M. 329, 940 P.2d 177). This Court will "resolve all disputed facts in favor of the successful party, indulge all reasonable inferences in support of a verdict, and disregard all evidence and inferences to the contrary." *Coates,* 1999–NMSC–013, ¶ 46, 127 N.M. 47, 976 P.2d 999.

{23} The Corporation stresses that the Scottsdale and San Diego managers work for a subsidiary and argue that the three employees cannot therefore be measured

against each other in order to determine whether one was the victim of discrimination. In other contexts, New Mexico courts have recognized that a subsidiary and its parent are generally viewed as independent corporations. *See Scott v. AZL Res., Inc.,* 107 N.M. 118, 120, 753 P.2d 897, 899 (1988) (refusing to pierce the corporate veil in order to hold parent corporation liable); *Cruttenden v. Mantura,* 97 N.M. 432, 434, 640 P.2d 932, 934 (1982) (holding that creditor could not garnish wages payable by subsidiary to its employee by serving writ of garnishment on parent corporation). These cases highlight the general independence of subsidiaries but do not address the narrow question that faces us today. Here we must analyze the Corporation's assertion that the earnings of employees of legally independent subsidiary corporations cannot, as a matter of law, be compared with the earnings of an employee of the parent corporation in order to establish a prima facie case of sex discrimination.

{24} Citing *Frank v. U.S. West, Inc.,* 3 F.3d 1357 (10th Cir.1993), the Corporation directs the Court to numerous tests aimed at determining whether a parent corporation and its subsidiary are to be considered single or separate entities. Barring our express adoption of them, these federal tests do not control our interpretation of a New Mexico state statute. *See Smith,* 109 N.M. at 517, 787 P.2d at 436 (refusing to bind New Mexico law to interpretations of federal law made by federal courts). Moreover, the tests cited by the Corporation are used "to determine whether a parent corporation is liable for the acts of its subsidiaries." *Frank,* 3 F.3d at 1362. In the present case, there are no acts of the subsidiary from which Plaintiff seeks to impose liability upon the parent. Rather, in an effort to illustrate what she contends is sex discrimination, she wishes to compare her wages to those of the subsidiary managers. Thus, the tests for determining the propriety of imposing liability on the parent for the acts of the subsidiary are inapposite to the present case.

{25} Amicus asks us to adopt a second body of law, based on the Equal Pay Act, 29 U.S.C. § 206(d) (1994), in support of its contention that Plaintiff's discrimination claim should have been denied at the summary judgment stage. Citing *Mulhall v. Advance Security, Inc.,* 19 F.3d 586, 590 (11th Cir.1994), for the proposition that under the Act a plaintiff can only compare herself to employees who work in the same "establishment," Amicus argues that the same requirement should apply to this case and emphasizes that Plaintiff clearly does not work in the same establishment as the managers of the Scottsdale and San Diego offices. Again, federal law does not control our interpretation of the NMHRA. More importantly, the single establishment requirement is included within the language of 29 U.S.C. § 206(d), but not the Section 28–1–7(A). We assume that if the legislature had intended the application of the NMHRA to be restricted to employees comparing their wages to other employees within the same building, it would have included language to that effect. *Cf. Hammonds v. Freymiller Trucking, Inc.,* 115 N.M. 364, 368, 851 P.2d 486, 490 (Ct.App.1993) ("If the legislature had intended to limit the broad language of [the Workers' Compensation Act] to employers that employed four or more persons *within New Mexico,* it would have so stated.").

{26} Neither the Corporation nor Amicus have cited any authority precluding an employee of a parent corporation from comparing her earnings to the employees of subsidiaries. In the absence of such law, whether the discrepancy in earnings between Plaintiff and the subsidiary managers was the result of intentional discrimination or merely a product of the parent-subsidiary distinction remains a genuine issue of material fact. The trial court properly denied Defendants' motion for summary judgment. We now question whether the jury could have reasonably inferred that the discrepancy in earnings resulted from the Corporation's intentional discrimination.

{27} In *Smith,* we borrowed from the federal methodology for establishing discrimination claims under Title VII of the Civil Rights Act when no direct evidence of discriminatory motive exists. 109 N.M. at 518, 787 P.2d at 437; *see also Cates v. Regents of N.M. Inst. of Mining & Tech.,* 1998–NMSC–

002, ¶¶ 15–26, 124 N.M. 633, 954 P.2d 65. Without "binding New Mexico law to interpretations made by the federal courts of the federal statute," we applied the guidelines articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), for determining the sufficiency of a discrimination claim under the NMHRA. *Smith*, 109 N.M. at 517, 787 P.2d at 436. According to that methodology, the plaintiff must first make a prima facie showing of discrimination. *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. The burden of production then shifts to the defendant to provide a legitimate non-discriminatory reason for his or her actions. *See id.* at 802–03, 93 S.Ct. 1817. Finally, when the defendant has met his or her burden of producing non-discriminatory motives, the plaintiff, in order to sustain the claim of discrimination, must show that defendant's purported non-discriminatory motives are pretextual. *See id.* at 803–04, 93 S.Ct. 1817. Since *McDonnell Douglas*, the United States Supreme Court has explained that a jury may infer discriminatory intent when the plaintiff successfully discredits the defendant's proffered non-discriminatory motives. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) ("The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination. . . ."). However, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.* at 507, 113 S.Ct. 2742 (quoting *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

{28} We first address whether Plaintiff made a prima facie case of discrimination in keeping with the first step of *McDonnell Douglas*. This Court has not yet had the opportunity to enunciate the elements of a prima facie case for wage discrimination under the NMHRA. As in *Smith*, we again borrow from the federal analog. Under Title VII, a plaintiff establishes a prima facie case for wage discrimination by showing that her job is similar to that of higher paid male employees. *See Sprague v. Thorn Ams., Inc.*, 129 F.3d 1355, 1363 (10th Cir. 1997). We use this standard.

{29} In the present case, Plaintiff provided evidence that she and the Scottsdale and San Diego managers occupy similar positions. Plaintiff testified that she performed essentially the same duties as the managers of the Scottsdale and San Diego offices, but that she was responsible for more employees and more business than the other two. She points out that in 1994, the managers of the Scottsdale office made $15,000 more than she did and the San Diego manager earned $55,000 more. In 1995, a manager hired to replace the previous Scottsdale manager earned $25,000 more than she did. In addition, she complains that the Corporation provided these managers with significantly more stock in the company. This evidence could have led a reasonable jury to conclude that the Corporation paid the male managers more than Plaintiff despite their similar positions. We hold that Plaintiff made a prima facie showing of discrimination.

{30} Although the Corporation's position that Plaintiff's wages cannot be compared with those of the Scottsdale and San Diego managers does not bar Plaintiff's claim, it does constitute a rebuttal of Plaintiff's prima facie case. In other words, the Corporation's argument that the offices and positions are incomparable implies that the pay disparity stems from legitimate, non-discriminatory reasons, namely that Plaintiff and the subsidiary managers were not similarly situated. These reasons satisfy the Corporation's burden of providing a non-discriminatory explanation for the pay differential.

{31} The burden then shifted back to Plaintiff to demonstrate that the Corporation's proffered explanation for the pay differential was pretextual. Here, Plaintiff offered evidence that she was equally if not more valuable to the company than the man-

agers who were paid significantly more than she was. In addition, Plaintiff testified that Mr. Shaw had declared that she was "easily worth *double*" the amount he was paying her. Finally, when Plaintiff left the Corporation, she filled a similar position in the surety business at a salary similar to that of the male managers of the subsidiaries. This evidence could reasonably have caused the jury to reject the Corporation's claim that the wage differential stemmed from differences between the offices or different levels of experience between the employees. Such a rejection, combined with the acceptance of Plaintiff's prima facie case, may have properly allowed the jury to infer the ultimate fact of intentional discrimination. *See St. Mary's Honor Ctr.*, 509 U.S. at 511, 113 S.Ct. 2742. Plaintiff's discrimination claim was supported by sufficient evidence.

### E. Amount of Damages

{32} The Corporation also argues that the jury's award of damages was excessive and not supported by the evidence. With regard to damages, "[t]he findings of the jury should not be disturbed as excessive except in extreme cases, as where it results from passion, prejudice, partiality, sympathy, undue influence, or some corrupt cause or motive where palpable error is committed by the jury, or where the jury has mistaken the measure of damages." *Allsup's Convenience Stores, Inc. v. N. River Ins. Co.*, 1999–NMSC–006, ¶ 16, 127 N.M. 1, 976 P.2d 1 (quoted authority omitted). Although we cannot be sure how the jury measured damages, we do know that Plaintiff's counsel suggested a measure of damages that entailed adding the cumulative salary discrepancy for the years 1993 through 1995 (between $58,000 and $88,000) to the seven percent difference between the stock that she and the male managers received ($108,000) plus ten percent interest on the stock she should have received ($29,000). That measure of damages was supported by evidence. According to this approach, Plaintiff should have received damages in the amount of anywhere between $195,000 and $225,000. This method represents an acceptable means of measuring damages in this case, and the jury's verdict of $206,416

falls well within the designated range. The damages were not excessive.

### III. BREACH OF CONTRACT CLAIM

{33} Plaintiff testified that the Corporation agreed to give her one-percent of the outstanding shares of its stock for each year that it employed her. According to Plaintiff, the Corporation also agreed to repurchase that stock at book value at whatever time she decided to leave the Corporation. Plaintiff left the Corporation in December of 1995 and sued for three percent of the stock, representing one percent for each of the three years she had been employed by the Corporation. Defendants argue that any agreement to repurchase Plaintiff's shares was subject to a shareholders' agreement that Plaintiff would forfeit her shares if she took the Corporation's customers with her to her new job. Defendants urge us to reverse the jury's verdict on the breach of contract claim based on their assertion that the jury instructions were improper, that the verdict was not supported by sufficient evidence, and that the amount of damages was excessive.

### A. Jury Instructions

{34} Defendants argue that instruction number 7, which was given to the jury, mischaracterized their position on the breach of contract claim. Instruction number 7 stated that "the parties agree that there was a contract to provide stock in Shaw and Associates, Inc., to Ms. Sonntag which would be repurchased when she left Shaw's employment. What is in dispute is whether there was a modification of that contract." Defendants suggest that Mr. Shaw never agreed to the existence of a contract to repurchase stock. Accordingly, Defendants assert that requested instruction number 3 should have been given in lieu of number 7. Requested instruction number 3 reads:

> [T]he parties agree that there was a commitment to issue 1% of the outstanding shares of stock per year for up to a ten-year period. What is in dispute is whether the agreement to issue the shares was subject to a shareholders agreement to repurchase the shares when Sonntag terminated her employment or if Sonntag

forfeited her shares in the event the customers of the defendant Shaw became customers of her or her new employer.

Defendants preserved this claim of error by alerting the court to the alleged defect in instruction number 7. Again, we review the trial court's decision to give instruction number 7 rather than instruction number 3 for an abuse of discretion. *See McDowell,* 119 N.M. at 704, 895 P.2d at 226.

{35} Apparently, Defendants' claim of error with regard to instruction number 7 is two-fold. First, they argue that the trial court committed error by giving the jury an instruction that suggested that the parties agreed that there was a "contract" rather than a "commitment." Second, Defendants contend that instruction number 7 improperly asked the jury to determine whether the contract was modified, rather than whether the "commitment" was subject to a shareholders' agreement at the time of commencement. In their own brief, Defendants use the words "commitment," "agreement," and "contract" interchangeably. Defendants do not argue that no contract existed. In any case, we do not perceive, nor do Defendants even suggest, any prejudicial result that might have stemmed from the jury's exposure to the word "contract" instead of the word "commitment."

{36} The essence of Defendants' argument seems to stem from their position that the contract was subject to restrictions at its inception, rather than, as the given jury instruction suggests, after it was modified. Defendants fail to support this contention with evidence that the agreement was subject to the non-compete clause at the time of commencement. Moreover, Defendants once again fail to demonstrate how this distinction might have prejudiced their case. To the extent that jury instruction number 7 erroneously mischaracterized Defendants' position, we hold that any alleged error was harmless.

## B. Sufficiency of the Evidence

{37} As mentioned above, in considering an insufficient evidence claim, we question whether substantial evidence supports the result reached by the trial court. *See Gillingham,* 1998–NMCA–143, ¶ 14, 126 N.M. 30, 966 P.2d 197. In so doing, we resolve disputed facts in favor of the successful party, indulge all reasonable inferences in support of a verdict, and disregard contrary evidence and inferences. *Coates,* 1999–NMSC–013, ¶ 46, 127 N.M. 47, 976 P.2d 999. Here, Plaintiff supported her breach of contract claim with evidence that, in lieu of a raise, Shaw promised to provide her with stocks in the Corporation and to repurchase those stocks unconditionally upon termination of her employment. The Corporation refused to repurchase the stocks. This evidence was sufficient to support a reasonable inference that a contract to repurchase the stocks existed between Plaintiff and the Corporation and that the Corporation breached.

## C. Amount of Damages

{38} In closing argument, Plaintiff's counsel implored the jury to award breach of contract damages ranging from $58,950 (representing 3 percent of the book value of the company in 1996 plus ten percent interest) to $87,600 (representing 3 percent of the book value of the company in 1999 plus interest). The jury awarded Plaintiff $63,607 in contract damages. Defendants argue that Plaintiff's contract damages should be measured at the time of the breach of contract, rather than at a later date. We agree. *Cf. Bd. of Educ. of Alamogordo Pub. Sch. Dist. No. 1 v. Jennings,* 102 N.M. 762, 765, 701 P.2d 361, 364 (1985) (" '[T]he purpose of allowing damages in a breach of contract case is the restoration to the injured of what [she] has lost by the breach, and what [she] reasonably could have expected to gain if there had been no breach.' ") (quoting *Allen v. Allen Title Co.,* 77 N.M. 796, 798, 427 P.2d 673, 675 (1967)). Providing Plaintiff with damages calculated according to the value of the Corporation three years after she left the company would place her in a better position than if the contract had been performed. *See id.* (" '[A] party whose contract has been breached is not entitled to be placed in a better position because of the breach than he would have been in had the contract been performed.' ") (quoting *Blair v. United States,* 150 F.2d 676, 678 (8th Cir.1945) (alteration in original)). We conclude that the

jury applied a mistaken measure of damages to the breach of contract claim. *See Allsup's,* 1999–NMSC–006, ¶ 16, 127 N.M. 1, 976 P.2d 1. We therefore remand the issue of damages to the trial court, and order that they be computed according to the book value of the Corporation in 1996, the date of the breach.

## IV. CONCLUSION

{39} Defendant Jerry Shaw is not personally liable for the discrimination claim damages. In all other respects, the jury's verdict and award of damages for the discrimination claim are affirmed. The breach of contract verdict is affirmed, and the award of damages for that claim is remanded to the trial court.

{40} **IT IS SO ORDERED.**

WE CONCUR: PAMELA B. MINZNER, Justice, PETRA JIMENEZ MAES, Justice.

PATRICIO M. SERNA, Chief Justice (concurring in result).

JOSEPH F. BACA, Justice (concurring in result).

SERNA, Chief Justice (concurring in result).

{41} I concur in the result. However, I respectfully disagree with the majority's analysis of several issues in this case. I write separately to indicate my position on these issues and to provide some guidance to trial courts and practitioners in formulating jury instructions in Human Rights Act cases.

{42} With respect to individual liability under the Act, I believe that the majority, in dicta, uses overly broad language that could be subject to misinterpretation. The majority states, "Defendants also argue that the owner of a corporation cannot be sued in a personal capacity for a violation of the NMHRA." The majority then rejects this argument. By using the phrase, "owner of a corporation," in construing Shaw's argument, the majority opens the door to shareholder liability for discrimination under the Act. Be-

cause Shaw's argument against individual liability focused on his role as an employee of the Corporation rather than as an owner of the Corporation, I presume that the majority's characterization of this issue is unintentional. Otherwise, it could be misinterpreted as expanding liability under the Act beyond what was contemplated by the Legislature. Section 28–1–7(A), the provision under which Sonntag brought her claim, prohibits discrimination by "an employer." The Act defines an "employer" as "any person employing four or more persons and any person acting for an employer." Section 28–1–2(B). Thus, Shaw is liable only to the extent that he acted for the Corporation in the discriminatory acts. He is not individually liable solely because of his ownership in the Corporation. I do not believe that the Legislature intended for courts to disregard an employer's corporate structure in determining liability under Section 28–1–7(A). *See generally Garcia v. Coffman,* 1997–NMCA–092, ¶¶ 14–25, 124 N.M. 12, 946 P.2d 216 (discussing the requirements for piercing the corporate veil in order to hold a shareholder personally liable). In any event, because Sonntag did not exhaust her administrative remedies against Jerry Shaw individually, the majority's discussion of this matter is not necessary to the resolution of this case. As dicta, I believe it is not binding in future cases.[1]

{43} I also believe that the majority's discussion of subsidiaries expands liability under the Act beyond the intent of the Legislature. I am in complete agreement with the majority's rejection of the single establishment requirement from the Equal Pay Act. However, I believe that the majority lacks a sound basis for rejecting the federal tests that determine whether a parent corporation and a subsidiary should be considered a single entity. The majority claims that these tests are inapposite because they only determine whether a parent corporation is liable for the acts of its subsidiaries and because Plaintiff does not seek to hold the parent liable in this case for acts of the subsidiary. I respectfully believe the majority is mistak-

**1.** Additionally, I do not believe that *Luboyeski* and *Mitchell–Carr* decided the issue of individual liability. *See, e.g., Fernandez v. Farmers Ins. Co.,* 115 N.M. 622, 627, 857 P.2d 22, 27 (1993) (stating that cases are not authority for propositions not considered).

en on two counts. First, Plaintiff is attempting to hold the parent corporation liable for its subsidiary's act of paying the subsidiary's managers a higher salary than the parent's manager. Second, the federal tests go beyond the limited use asserted by the majority. These tests are designed more generally to determine whether the different acts at issue in the case are those of a "single employer" for purposes of Title VII. *See Romano v. U–Haul Int'l,* 233 F.3d 655, 662–67 (1st Cir.2000). Because Section 28–1–7(A) requires the act of "an employer," these tests seem particularly appropriate for the interpretation of the Human Rights Act. This Court has previously looked to federal courts for guidance in the interpretation of the Act, and the majority provides no reason to reject the federal approach in this circumstance.

{44} With respect to the parent-subsidiary relationship, the majority asserts that Defendants and Amicus failed to cite any authority that would preclude a comparison of earnings between an employee of a parent corporation and employees of its subsidiaries. On the contrary, however, Defendants relied on this Court's opinion in *Cruttenden.* Under that case, a subsidiary and a parent are viewed as independent corporations, and thus, the Scottsdale and San Diego managers were employees of Jerry Shaw and Associates, Inc., an Arizona corporation, and not of Shaw and Associates, Inc., the New Mexico corporation. Because, for a disparate treatment claim under the Act, an employee must demonstrate that the employer took adverse employment action against the plaintiff in comparison with another employee who is similarly situated, the plaintiff must show, as an initial matter, that the comparison individuals are employees of the employer. In this case, the Act required Plaintiff to show that the Scottsdale and San Diego managers were employees of Shaw and Associates, Inc. Thus, Plaintiff had to demonstrate why the employees of the Arizona corporation should be considered the employees of the New Mexico corporation for purposes of Section 28–1–7(A), despite the parent-subsidiary structure. The federal tests summarily dismissed by the majority would seem particularly helpful in resolving this question.

{45} Even though I believe that the trial court should have instructed the jury concerning the parent-subsidiary structure of the corporation in accordance with either the instrumentality or integrated enterprise tests discussed in *Frank,* 3 F.3d at 1362 & n. 2, I believe that the failure to give this instruction was harmless error in the present case. Under the federal test, "there is near unanimity that control of labor operations i.e., control of employment decisions, is the most important ... factor[ ]." *Romano,* 233 F.3d at 666. "[T]he ultimate question [is] whether the parent corporation was a final decisionmaker in connection with the employment at issue." *Id.* Shaw did not contest that he was responsible for fixing the salary of all three managers. The Scottsdale and San Diego managers received stock in the parent corporation in exchange for their management of the subsidiary, and they were officers of the parent corporation. In addition, because Shaw and Associates, Inc., owns all of the stock in Jerry Shaw and Associates, Inc., Shaw indicated that, through his majority ownership in Shaw and Associates, Inc., he "control[s]" both companies. Thus, there was no true jury question as to whether the fixing of the salaries for these three individuals could be considered the act of "an employer" for purposes of Section 28–1–7(A).

{46} The final issue on which I hold a different view from the majority is the trial court's instructions to the jury concerning the requisite facts Plaintiff had to prove in order to support a claim of discrimination. Initially, I respectfully disagree with the majority's interpretation of Rule 1–051(I) and its conclusion that the Corporation failed to preserve this issue. The majority's interpretation conflicts with case law discussing this rule and with precedent from this Court discussing a nearly identical rule of criminal procedure. The purpose of the preservation requirements in Rule 1–051(I) is similar to the purpose of the requirement of preservation in Rule 12–216(A): to ensure that a ruling by the trial court is fairly invoked by the parties. In *Andrus,* the Court of Appeals stated that "[t]o preserve error in instructing the jury, the gas company was required to object *or tender a correct instruction.*" 110 N.M. at 597, 798 P.2d

at 198 (emphasis added). The tendering of a correct instruction, even more than an objection, adequately advises the trial court of the party's position and the alleged error in the given instructions, and it fairly invokes a ruling from the trial court. *See Hinger*, 120 N.M. at 441, 902 P.2d at 1044 ("Defendants failed to submit their own instruction on the point which would have advised the court more specifically of the 'claimed vice.' "). In *Santillanes v. State*, 115 N.M. 215, 218, 849 P.2d 358, 361 (1993), this Court held that the defendant preserved the issue of an erroneous instruction under an almost identical rule of criminal procedure, Rule 5–608(D), by tendering his own instruction. The Court further concluded that, even though the tendered instruction was an incorrect statement of law, it was adequate to preserve the issue because the judge instructed on the subject and the tendered instruction "informed the trial judge of the claimed vice in the charge given to the jury." *Id.*

{47} In this case, Defendants tendered numerous instructions outlining Plaintiff's burden in proving discrimination under the Human Rights Act, specifically the burden to prove that the comparison employees were similarly situated and that Defendants' proffered reason was false. For example, Defendants' Instruction 1 would have informed the jury of Defendants' claim "that [Plaintiff's] job was not substantially the same, nor did she have the same responsibilities or apply the same effort or have the same authority or job skills as the managers of the subsidiary corporation. Shaw states that Sonntag was not a manager in the same sense as the managers of the offices in the subsidiary corporation." Defendants' Instruction 9 provided:

> You must consider any legitimate, nondiscriminatory reason or explanation stated by Shaw and Associates for its decision. If you find that Shaw and Associates has stated a valid reason, then you must decide in favor of Shaw and Associates unless Sonntag proves by a preponderance of the evidence that the stated reason was not the true reason but is only a pretext or

excuse for discriminating against Sonntag because of her gender.

The trial court instructed the jury as follows:

> To establish a claim of discrimination on the part of defendant Shaw, Ms. Sonntag has the burden of proving the following contentions: 1. That Shaw paid Ms. Sonntag a lower salary than would have been paid if she had been male; or 2. That Shaw committed to issue to Ms. Sonntag less stock in Shaw and Associates than would have been issued or committed if she had been male; and 3. That Shaw's actions were, more likely than not, motivated by the plaintiff's sex.

Defendants objected to the court's refusal of their instructions. Presumably, the trial court rejected Defendants' proffered instructions based on its apparent belief that this given instruction and a single sentence articulating a general denial by Defendants adequately informed the jury about the nature of a discrimination claim under the Act. The trial court clearly considered and ruled on Defendants' proffered instructions. Defendants therefore fairly invoked a ruling from the trial court as to whether to instruct the jury on the requirement that the other managers be similarly situated with Plaintiff and whether to instruct the jury that Plaintiff bore the burden of proving pretext. Defendants preserved this issue under both the plain language and the underlying purpose of Rule 1–051(I).

{48} I believe that the trial court erred in refusing Defendants' tendered instructions. As indicated by the majority, this Court has adopted the *McDonnell Douglas* test in our interpretation of Section 28–1–7(A). As a result, a plaintiff attempting to demonstrate discrimination through disparate treatment must prove that the employer treated the plaintiff differently from other employees who are not members of the relevant protected class and who are similarly situated in all relevant respects with the plaintiff. The plaintiff must also prove that the employer's proffered reason for the adverse employment action is false. The *McDonnell Douglas* test is a burden-shifting mechanism that assists courts in deciding whether a case should be submitted to a jury. As a result, courts have

uniformly held that it is improper to include the entire *McDonnell Douglas* test in instructions to the jury due to the potential for juror confusion over the highly technical burden-shifting aspect of the test. *See, e.g., Dudley v. Wal–Mart Stores, Inc.,* 166 F.3d 1317, 1321–22 (11th Cir.1999). However, some courts have approved instructions that include the plaintiff's burden to prove the facts necessary to establish a prima facie case and pretext. *See, e.g., Watson v. Southeastern Pa. Transp. Auth.,* 207 F.3d 207, 221 (3d Cir.2000) ("[I]t is clearly proper to instruct the jury that it may consider whether the factual predicates necessary to establish the prima facie case have been shown.").

{49} I believe this approach is consistent with the United States Supreme Court's opinions in *St. Mary's Honor Center* and *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), both of which this Court has applied in our interpretation of Section 28–1–7(A). Under these cases, a jury can properly infer the ultimate fact of intentional discrimination from disparate treatment only if it finds that the plaintiff satisfied all elements of the prima facie case and that the employer's proffered reason for the adverse employment action is false. *See Reeves,* 530 U.S. at 148, 120 S.Ct. 2097. Thus, it would seem logical that the jury be specifically instructed on these matters. Such an instruction would also make the jury aware of the Legislature's directive that discrimination is not unlawful if it is due to "bona fide occupational qualifications." Section 28–1–7(A). Therefore, I believe that trial judges presiding over discrimination claims under Section 28–1–7(A) based on disparate treatment should instruct jurors that they are "entitled to infer, but need not, that the plaintiff's ultimate burden of demonstrating intentional discrimination by a preponderance of the evidence can be met if they find that the facts needed to make up the prima facie case have been established and they disbelieve the employer's explanation for its decision," but the instruction should not include the burden-shifting aspect of *McDon-*

*nell Douglas. Smith v. Borough of Wilkinsburg,* 147 F.3d 272, 280 & n. 4 (3d Cir.1998).

{50} Moreover, this Court has long held that a party is entitled to an instruction on a proper theory of the case as long as the theory is supported by the evidence. In this case, Defendants had two theories of the case that were supported by the evidence: (1) that the San Diego and Scottsdale managers were not similarly situated with Plaintiff; and (2) that the difference in pay was based on bona fide job qualifications such as education and experience. The given instructions did not inform the jury of these theories. Thus, I believe that the trial court erred in refusing Defendants' tendered instructions concerning Plaintiff's burden in proving her claim of discrimination.

{51} Nonetheless, I do not believe that the instructional error in this case requires reversal. The instructions given by the trial court placed the ultimate question contained in Section 28–1–7(A) before the jury. In addition, the jury had the benefit of arguments by the parties concerning the different aspects of Plaintiff's claim of discrimination. While I believe that the jury would have benefitted from greater detail in the instructions and that Defendants were entitled to have the jury instructed on their theory of the case, I would conclude that the failure to instruct the jury with greater specificity on Plaintiff's burden amounted to harmless error. *Cf. White v. N.H. Dep't of Corr.,* 221 F.3d 254, 264–65 (1st Cir.2000) (rejecting a claim that the failure to instruct the jury that the plaintiff had the burden to prove the falsity of the employer's proffered reason constituted reversible error because the court's instruction adequately presented the ultimate question under Title VII). Therefore, I concur in the result.

I CONCUR: JOSEPH F. BACA, Justice.